UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

Appeal No. 23-14225

_____

TAMARA OGIER, AS TRUSTEE FOR THE BANKRUPTCY ESTATE OF BRITTANY DAKOTA BOSLEY ET AL.,

**Plaintiffs – Appellants,**

**vs.**

INTERNATIONAL FOLLIES, INC. D/B/A CHEETAH,

**Defendant – Appellee**

ON APPEAL FROM JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
District Court Docket No. 1:21-cv-2421-VMC

_____

**PRINCIPAL BRIEF OF APPELLANTS**

_____

DELONG, CALDWELL, BRIDGERS,
FITZPATRICK & BENJAMIN, LLC

101 Marietta Street NW                Matthew W. Herrington
Suite 2650                            Georgia Bar No. 275411
Atlanta, Georgia 30303                Charles R. Bridgers
(404) 979-3150                        Georgia Bar No. 080791
matthew.herrington@dcbflegal.com
charlesbridgers@dcbflegal.com
                                      *Attorneys for Plaintiffs–*
                                      *Appellants*

**Certificate of Interested Persons**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, Appellants hereby file this Certificate of Interested Persons and Corporate Disclosure Statement.

The following persons or entities, to the best of Appellants' knowledge, have an interest in the outcome of this matter:

**Appellants:** Tamara Ogier and Brittany Bosley

**Appellees:** International Follies, Inc. d/b/a Cheetah

**United States District Judge:** Hon. Victoria Marie Calvert

**Counsel for Appellants:** Matthew W. Herrington and Charles R. Bridgers; DeLong, Caldwell, Bridgers, Fitzpatrick & Benjamin, LLC

**Counsel for Appellees:** Andrea Pawlak; Constangy, Brooks, Smith & Prophete, LLP

Dated: March 13, 2024.

*s/ Matthew W. Herrington*
Matthew W. Herrington
Georgia Bar No. 275411

## STATEMENT REGARDING ORAL ARGUMENT

In this appeal, Appellants ask the Court not just to reverse the District Court's summary judgment order, but to declare invalid an interpretive rule propounded by the Department of Labor in a case of first impression. Appellants respectfully submit that oral argument would be very helpful to the Court given the complexity and importance of the issues raised.

## Table of Contents

Certificate of Interested Persons ................................................................ C1

Statement Regarding Oral Argument ............................................................ i

Table of Contents ........................................................................................ ii

Table of Authorities .................................................................................... iv

Statement of Subject-Matter and Appellate Jurisdiction ......................... vii

Statement of Issues on Appeal .................................................................... 1

Statement of the Case .................................................................................. 2

    1.    Proceedings Below ............................................................... 2

    2.    Statement of Facts ................................................................ 2

    3.    Standard of Review ............................................................. 8

Summary of the Argument ........................................................................... 8

Argument and Citations of Authority ........................................................ 11

    1.    The FLSA Prohibition on Tip Sharing with "Managers
        or Supervisors" ................................................................. 11

    2.    Cheetah Violated the FLSA by Allowing House Moms
        to Take a Portion of Plaintiff Bosley's Tips ....................... 13

        a.    House Moms were "supervisors or managers" prohibited
            from taking employment tip ........................................ 13

        b.    The FLSA's tip-sharing prohibition does not permit "voluntary" tip-
            sharing with managers and supervisors ........................... 17

        c.    Cheetah had knowledge of and "allowed" the prohibited
            tip-sharing arrangement ................................................ 18

3.    The DOL's Definition of "Supervisors and Managers" is Untenable ............................................................. 21

    a.    29 C.F.R. § 531.52(b)(2) is an Interpretive Rule, and is not Entitled to *Chevron* Deference ..................................... 22

    b.    The Department of Labor's Interpretive Rule Defining "Supervisors or Managers" is Untenable and Should be Rejected ......................................................... 23

    c.    The Department of Labor's Conjunctive Test Should be Replaced with a Disjunctive Version of the Same Test ................. 27

4.    Conclusion ............................................................. 29

Certificate of Compliance with F.R.A.P. RULE 32(A)(7)..................................... 30

Certificate of Service ............................................................. 31

## Table of Citations and Authorities

*Aguila v. Corp. Caterers II, Inc.*,
  199 F. Supp. 3d 1358 (S.D. Fla. 2016) ...................................................... 24

*Barrentine v. Arkansas-Best Freight Sys., Inc.*,
  450 U.S. 728, 101 S. Ct. 1437 (1981) .................................................. 17–18

*Bay Ridge Operating Co. v. Aaron*,
  334 U.S. 446 (1948) .................................................................................. 23

*Barcellona v. Tiffany English Pub, Inc.*,
  597 F.2d 464 (5th Cir.1979) .................................................................... 20

*Brennan v. Gen. Motors Acceptance Corp.*,
  482 F.2d 825 (5th Cir. 1973) ................................................................... 19

*Brooklyn Savings Bank v. O'Neil*,
  324 U.S. 697, 65 S. Ct. 895 (1945) .......................................................... 18

*Carlisle Equip. Co. v. U.S. Sec'y. of Labor & Occupational Safety*,
  24 F.3d 790 (6th Cir. 1994) ..................................................................... 20

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
  467 U.S. 837, 104 S. Ct. 2778 (1984) ................................................. 22–23

*Gulf King Shrimp Co. v. Wirtz*,
  407 F.2d 508, 512 (5th Cir. 1969) ...................................................... 19–20

*Hellmers v. Town of Vestal*,
  969 F. Supp. 837 (N.D.N.Y. 1997) .......................................................... 20

*Highmark Inc. v. Allcare Health Mgmt. Sys.*,
  572 U.S. 559, 134 S. Ct. 1744 (2014) ........................................................ 8

*Hoffman v. Bear Chase Brewing Co., LLC*,
  Civil Action No. 1:21-cv-1443,
  2023 U.S. Dist. LEXIS 36146 (E.D. Va. Mar. 3, 2023) ............................ 24

*Holloman v. Mail-Well Corp.*,
  443 F.3d 832 (11th Cir. 2006) .................................................................... 8

*Huff v. Dekalb County*,
    516 F.3d 1273 (11th Cir. 2008) .................................................. 8

*Knox v. Mass. Soc'y for Prevention of Cruelty to Animals*,
    425 N.E.2d 393 (1981) ..................................................... 26

*Kungys v. United States*,
    485 U.S. 759 (1988) ........................................................ 26

*Monahan v. Cty. of Chesterfield*,
    95 F.3d 1263 (4th Cir. 1996) .................................................. 22

*Reich v. Department of Conservation & Natural Resources*,
    28 F.3d 1076 (11th Cir. 1994) ................................................. 19

*Sidell v. MedMark Servs. Inc.*,
    No. 2:16-cv-176-RWS, 2017 U.S. Dist. LEXIS 220486,
    2017 WL 6994574 (N.D. Ga. Aug. 3, 2017) ........................................ 19

*State ex rel. Miller v. Claiborne*,
    505 P.2d 732 (Kan. 1973) ..................................................... 26

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
    471 U.S. 290 (1985) ........................................................ 18

## Other Authority

19 Moore's Federal Practice - Civil § 206.04 ..................................................8

28 U.S.C. § 1291 ........................................................................vii

28 U.S.C. § 1331 ........................................................................vii

29 U.S.C. § 201 .........................................................................vii

29 U.S.C. § 203 ............................................................. 1, 9–11, 18, 21–22, 24

*   29 C.F.R. § 531.52(b)(2)......................................................1, 9, 12, 22–23

29 C.F.R. § 531.54(b) ...................................................................11

29 C.F.R. § 541.100 ...................................................................12–13, 27

29 C.F.R. § 541.102 ...............................................................14, 27–28

29 C.F.R. § 778 ..............................................................................22–23

Department of Labor Wage & Hour Division
    Field Assistance Bulletin 2018-3 .................................................11

Indeed Editorial Team, "Manager vs. Supervisor: What's the Difference?,"
    April 3, 2020, https://www.indeed.com/career-advice/career-
    development/manager-vs-supervisor (last accessed March 13, 2024)........25

https://hr.berkeley.edu/node/3818 (last accessed March 13, 2024) .................25

## Statement of Subject-Matter and Appellate Jurisdiction

The District Court was vested with original jurisdiction pursuant to 28 U.S.C. § 1331 because this action arose under the Fair Labor Standards Act of 1938 as amended, 29 U.S.C. § 201 *et seq*., ("the FLSA") a federal statute affecting interstate commerce.

This Court has jurisdiction over this appeal from the District Court's Order [Doc. 27] of March 27, 2023, granting Defendants–Appellees' Motion for Summary Judgment pursuant to 28 U.S.C. § 1291 and Order [Doc. 63] of December 21, 2024, denying Plaintiffs–Appellants' Motion for Reconsideration. Plaintiffs–Appellants timely filed their Notice of Appeal. [Doc. 69]

## Statement of the Issues on Appeal

1.    Whether the District Court should have found that Cheetah house moms were managers and/or supervisors within the meaning of 29 C.F.R. § 531.52(b)(2) under the Department of Labor's current definition.

2.    Whether the District Court erred in permitting purportedly "voluntary" transfers of employee tip proceeds to Cheetah managers and supervisors, despite Congress' clear prohibition of the same in 29 U.S.C. § 203(m)(2)(B).

3.    Whether the District Court erred in refusing to impute to Defendant Cheetah the knowledge that its managers and supervisors were taking a portion of tipped employees' tips.

4.    Whether the Department of Labor's administrative rule at 29 C.F.R. § 531.52(b)(2) defining "supervisors or managers" as applied to 29 U.S.C. § 203(m)(2)(B) is untenable and should be modified, and whether Cheetah floor managers and house moms were "supervisors" or "managers" under the proposed modified definition.

## Statement of the Case

### 1.    Proceedings Below

Plaintiff–Appellant Tamar Ogier, in her capacity as trustee for the bankruptcy estate of debtor Brittany Bosley, filed her Complaint on June 14, 2021, alleging violations of the overtime requirements of the Fair Labor Standards Act by Defendant–Appellee International Follies, Inc. d/b/a Cheetah with respect to Bosley. [Doc. 1] Defendant filed its Answer on July 2, 2021. [Doc. 6] After receiving leave to amend, Plaintiff Ogier and Co-Plaintiff Brittany Bosley filed their First Amended Complaint on December 30, 2021, [Doc. 17] and Defendants filed their Answer to the First Amended Complaint on January 3, 2022. [Doc. 31] Defendant filed a Motion for Summary Judgment on May 20, 2022, [Doc. 42] to which Plaintiffs filed a Response. [Doc. 47] The District court issued its Order granting summary judgment in favor of Defendant on March 27, 2023. [Doc. 53] Plaintiffs filed a Motion for Reconsideration on April 3, 2023 [Doc. 56], and the Court issued an Order denying the Motion on December 21, 2023. [Doc. 63] Plaintiffs timely filed their Notice of Appeal on December 26, 2023. [Doc. 69]

### 2.    Statement of Facts

### Dancer Relationship to Floor Managers and House Moms

Defendant operates Cheetah, an adult-entertainment establishment in Atlanta, Georgia. Plaintiff Bosley was employed at Cheetah as an exotic dancer from

November 8, 2019, through March 18, 2020, and again from June 8, 2020, until February 3, 2022. [Doc. 42-7 – pp. 10–11, 32–50, 213–279] Cheetah treated Bosley as an employee and paid her $2.13 an hour, plus tips. [Doc. 42-7 – pp. 11–12]

During Bosley's employment, Cheetah employed security personnel (a/k/a bouncers) who were referred to as "floor managers." Floor managers exercised a degree of control over dancers in numerous ways. They handled dancer complaints about customers and other dancers when the situation was urgent [Doc. 47-1 – pg. 3], and they would direct dancers to work in different areas of the club or to stay away from specific customers and dancers. [Doc. 47-1 – pg. 4] Floor managers are also responsible for administering breathlyzer tests, observing dancers for signs that they are overly intoxicated and unsafe to drive, checking VIP rooms for dancer safety, and enforcing no smoking rules. [Doc. 47-1 – pg. 5] They also monitor the premises to ensure that dancers are safe when coming and going from the property. [Doc. 47-1 – pg. 5] Floor managers are responsible for monitoring the club's legal compliance with respect to laws prohibiting customer–dancer contact, prostitution, and sexually explicit behavior. [Doc. 47-1 – pp. 5–6; Doc. 42-7 – pg. 87] When a floor manager believed that they have witnessed a legal violation, they were authorized to order a dancer off stage or out of a VIP performance. [Doc. 47-1 – pp. 5–6] Floor managers also make recommendations to customers for specific

dancers to do performances; these recommendations are entirely at the floor manager's discretion and the performances that result from their recommendations are a major source of dancer income. [Doc. 47-1 – pp. 4–5] Floor managers informed dancers when their turn to appear on stage had come to ensure that they appeared at that time. [Doc. 42-7 – pp. 61, 85] On one occasion, a floor manager became very upset when Bosley was late to a stage set and said that if it happened again he wouldn't let her check into VIP all night. [Doc. 42-7 – pg. 85]

Cheetah also employed "house moms." House moms are responsible for interviewing prospective dancers who want to audition. [Doc. 47-1 – pg. 2] That process entails filling out paperwork with the house mom's assistance and answering a series of questions asked by the house mom. [Doc. 47-1 – pg. 2] Following that interview, if the house mom believes you are a good candidate, she will then give your application materials to the general manager for a final stage audition. [Doc. 47-1 – pg. 2]

House moms also train newly hired dancers, go through club rules, explain club operations, and answer questions about how to perform the job. [Doc. 47-1 – pg. 2] House moms decide whether or not to approve dancer requests to trade or miss a shift. [Doc. 47-1 – pg. 2] They regularly direct dancers during their shifts, ordering them to appear on stage or the floor when needed and telling them to change their

clothing if it is problematic or unattractive. [Doc. 47-1 – pg. 3] If a dancer showed up late for her shift, the house mom could send her home. [Doc. 47-1 – pp. 83–84]

House moms keep written records relating to attendance, attendance, and incidents that need to be communicated to management, who are often not present, leaving the house moms in charge. [Doc. 47-1 – pg. 3] House moms handle complaints by dancers about customers or other dancers. [Doc. 47-1 – pg. 3] And even when a manager is present, the house mom is typically the person that a dancer goes to with such problems. [Doc. 47-1 – pg. 3]

House moms discipline dancers by sending them home if they are too drunk, have missed stage sets, have shown a bad attitude, or for any number of other reasons. [Doc. 47-1 – pg. 4] They regularly discipline dancers when no manager is present. [Doc. 47-1 – pg. 4]

Cheetah house moms regularly give feedback to dancers about their job performance and instruct them how to perform their jobs better, such as dancing tips, how to approach and interact with customers, or reminding them about the rules of when certain articles of clothing should be removed. [Doc. 47-1 – pg. 4]

House moms regularly police dancers' clothing and footwear, telling them to change them if they do not comply with club policy (e.g., four-plus inch heels and open toes are required) or simply if they find them unattractive or too worn. [Doc.

47-1 – pg. 5] The house moms can refuse to let a dancer on stage if they do not approve of their clothing. [Doc. 47-1 – pg. 5]

Like floor managers, house moms were also responsible for administering breathlyzer tests, observing dancers for signs that they are overly intoxicated and unsafe to drive, checking VIP rooms for dancer safety, enforcing no smoking rules, and intervening when customers are unruly. [Doc. 47-1 – pg. 5] They also monitored the club's legal compliance with respect to laws prohibiting customer–dancer contact, prostitution, and sexually explicit behavior. [Doc. 47-1 – pp. 5–6]; [Doc. 42-7 – pg. 87] House moms were authorized to order a dancer off stage or out of a VIP performance if she believed a legal violation had occurred. [Doc. 47-1 – pp. 5–6]

In addition to exercising disciplinary power, house moms and floor managers also regularly exercised the power to recommend specific dancers to customers for lucrative VIP performances. [Doc. 47-1 – pg. 4] House moms frequently requested that dancers perform extra stage sets, sometimes offering to allow a dancer to leave her scheduled shift early if she would agree to do the extra set. [Doc. 47-1 – pg. 4] Bosley observed that floor managers and house moms would only recommend dancers for lucrative VIP performances if they knew that the dancer was going to tip them out "often and well." [Doc. 42-7 at pp. 53–54, 58]

**Tip Outs to Floor Managers and House Moms**

At the time Bosley was hired, she was shown a written policy *requiring* dancers to pay a percentage of their tips each shift to the floor managers and disc jockeys [Doc. 42-7 – pg. 208] The policy continues that if a dancer feels pressured or coerced to share tips with other employees, she must contact the General Manager. [Doc. 42-7 – pg. 208]

Notwithstanding that written policy, Bosley and other dancers nevertheless regularly paid a portion of their tips to house moms. [Doc. 42-7 – pp. 94–97] Bosley testified that she experienced "passive-aggressive coercion" to give additional tips to floor managers and house moms because they

> would only recommend certain dancers to go to tables that
> wanted to do VIPs and spend a lot of money and stuff like that.
> They would only recommend the dancers to those tables if the
> dancer they knew that dancer was going to tip them out. . . .
> The only way that bouncers would recommend you to tables is
> if you tipped them. . . . Same with like house moms. They
> would let you leave early or maybe miss a day if you tipped
> them often and well, but otherwise they wouldn't.

[Doc. 42-7 – pp. 53–54] Bosley personally noticed how floor managers would no longer recommend them to customers if they stopped tipping them on top of the mandatory tip pool contribution. [Doc. 42-7 – pp. 54–55] Bosley also observed that house moms began recommending customers to her after she got on their good side by tipping them well. [Doc. 42-7 – pg. 58] Bosley never reported her feelings of coercion to the General Manager. [Doc. 42-7 – pp. 52–53]

3.    **Standard of Review**

"This court reviews de novo a district court's grant or denial of summary judgment." *Huff v. Dekalb County*, 516 F.3d 1273, 1277 (11th Cir. 2008) (citing *Holloman v. Mail-Well Corp*., 443 F.3d 832, 836 (11th Cir. 2006)). A trial court's conclusions on questions of the application, interpretation, and construction of law are reviewed *de novo* on appeal. *Highmark Inc. v. Allcare Health Mgmt. Sys*., 572 U.S. 559, 134 S. Ct. 1744 (2014). A circuit court may substitute its own judgment regarding a conclusion of law made by the trial court. 19 Moore's Federal Practice - Civil § 206.04 (citing cases).

## Summary of the Argument

Cheetah house moms were managers and/or supervisors within the meaning of 29 C.F.R. § 531.52(b)(2)—using the Department of Labor's current definition of those terms—and could not be permitted take a portion of Plaintiff Bosley's tips. For reasons that were not stated, ***the District Court did not actually address this question***. But house moms' status as managers and/or supervisors alone should have ended the Court's analysis preventing summary judgment.

The District Court's characterization of tip transfers to house moms as "voluntary" utterly misses the mark: is a fundamental principle expressed over the better part of a century of FLSA interpretation that employees may not waive the protections of the Act. The inherent ability of employers and managers to coerce

their employees cannot permit exceptions for "voluntary" waivers of FLSA rights. If it were otherwise, the FLSA would be a dead letter and employers and employees could simply "agree" that the FLSA need not apply.

Additionally, the District Court's conclusion that Cheetah did not "allow" Bosley to share her tips demonstrates another fundamental misapprehension of the FLSA's requirements. First, ***Cheetah never even argued it was actually unaware of dancer tip sharing with house moms***. Second, even if it had made that argument, it ***would still be charged with the knowledge*** of the tip sharing practices in effect at its business, especially those involving its managerial employees.

Finally, with respect to both house moms *and floor managers*, Plaintiffs contend that the Department of Labor's administrative rule at 29 C.F.R. § 531.52(b)(2) defining "supervisors or managers" as applied to the § 203(m)(2)(B) tip-sharing prohibition is untenable and should be modified.

The Department's current rule improperly conflates two distinct job categories—i.e., manager and supervisor—under a single definition. Moreover, it entirely erases the category of supervisor by requiring that supervisors have a primary duty of "management." Even more egregiously, the Department's rule would even exclude some employees who actually have the primary duty of "management" from the § 203(m)(2)(B) tip-sharing exclusion. The Department's

current definition ignores the plain language of § 203(m)(2)(B) and undermines Congressional intent. It should therefore be rejected and replaced.

Under the proposed modified definition encouraged by Plaintiffs, house moms and floor managers should both be found to be either supervisors or managers who could not take from their subordinates' tips.

**Argument and Citations of Authority**

**1.    The FLSA Prohibition on Tip Sharing with "Managers or Supervisors"**

Effective March 23, 2018, with the passage of the Consolidated Appropriations Act of 2018 ("CAA"), the Fair Labor Standards Act ("FLSA") provides that "[a]n employer may not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips, regardless of whether or not the employer takes a tip credit." 29 U.S.C. § 203(m)(2)(B).

This prohibition stands apart from the general rules regarding a tip pool's validity. It is an entirely separate prohibition that complements the tip pooling rules. Tip pooling rules only apply to situations where the employer takes the tip credit and pays a sub-minimum wage,[1] whereas the prohibition in § 203(m)(2)(B), by its explicit language, applies irrespective of the tip credit's application.

"Manager" and "supervisor" as used in FLSA § 3(m)(2)(B) are not defined terms. The Department of Labor's ("DOL") Wage & Hour Administrator

---

[1] *See* 29 C.F.R. § 531.54(b) for the requirements of valid tip pooling arrangements among tipped employees. After passage of the CAA, DOL guidance prohibiting certain tip sharing arrangements irrespective of the tip credit's application was rendered invalid. *See* Field Assistance Bulletin 2018-3 ("The Act also provides that portions of WHD's regulations . . . that barred tip pooling when employers . . . do not claim a tip credit shall have no further force or effect (until any future action by the WHD Administrator.")).

("Administrator") issued a 2020 interpretive rule (effective March 1, 2021) purporting to propound a definition:

> For purposes of section 3(m)(2)(B), the term **"manager" or "supervisor" shall mean any employee whose duties match those of an executive employee as described in § 541.100(a)(2) through (4)** . . . of this chapter.

29 C.F.R. § 531.52(b)(2) (emphasis added). The subsections incorporated by reference in that definition are the duties portion of the FLSA's executive exemption definition:

> (2) **Whose primary duty is management** of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who **customarily and regularly directs the work of two or more other employees; <u>and</u>**
>
> (4) Who has the **authority to hire or fire other employees** or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a) (emphasis added). This is a conjunctive test, so all factors must be met for the definition of "manager or supervisor" that adopts it. Thus, while Congress banned tip sharing with "managers or supervisors," the DOL's definition would theoretically permit tip sharing with an employee whose primary duty is "management," or who can hire and fire the employees whose tips s/he shares in, as long as not all the factors were present. As the DOL would have it,

having a "primary duty of management" is not alone enough to make a manager,

and supervisors are not supervisors unless they are also managers.

**2.    Cheetah Violated the FLSA by Allowing House Moms to Take a Portion of Plaintiff Bosley's Tips**

**a.    House Moms were "supervisors or managers" prohibited from taking employment tips**

***Defendant never argued at summary judgment that house moms were not***

***managers or supervisors***. That fact alone should have prevented summary

judgment. But if the Court deems it necessary to engage in this analysis, the record

does in fact show  that house moms were indisputably "supervisors or managers"

under the Department of Labor's *current* definition of those terms and were

prohibited from taking a portion of Plaintiff Bosley's tips.

     *i.    House moms had a primary duty of management.*

"Management" as used in 29 C.F.R. § 541.100(a)(2) includes, *inter alia*:

- interviewing, selecting, and training of employees;

- setting and adjusting their rates of pay and hours of work;

- directing the work of employees;

- handling employee complaints and grievances;

- disciplining employees;

- apportioning the work among the employees;

- providing for the safety and security of the employees or the property; and

- monitoring or implementing legal compliance measures.

*See* 29 C.F.R. § 541.102.

As Bosley showed in the District Court, Cheetah House moms regularly performed all the duties listed above by:

- interviewing and recommending prospective dancers to the general manager;

- training newly hired dancers and instructing them on club rules

- explaining how to perform the dancer job;

- deciding whether or not to approve dancer requests to trade or miss a shift;

- regularly directing dancers, ordering them to appear on stage or the floor when needed, and telling them to change their clothing;

- sending home dancers who arrived late;

- handling complaints by dancers about customers or other dancers;

- disciplining dancers by sending them home for being too drunk, missing stage sets, or having a bad attitude;

- giving feedback to dancers about their job performance;

- recommending specific dancers to customers for VIP performances;

- policing dancers' clothing and footwear;

- administering breathlyzer tests;

- checking VIP rooms for dancer safety;

- enforcing no smoking rules;

- intervening when customers are unruly; and

- monitoring the club's legal compliance with respect to customer–dancer contact, prostitution, and sexually explicit behavior.

[Dkt. 42-7 – pp. 83–84, 87; Doc. 47-1 - ¶¶ 3–18] It is indisputable that, given all these duties, Cheetah House moms had the primary duty of management.

    *ii.*   *House moms customarily and regularly directed the work of two or more other employees.*

The evidence at summary judgment showed that house moms customarily and regularly directed the work of the dancers at Cheetah by:

- ordering dancers to appear on stage or the floor when needed;

- telling dancers to change their clothing if they deemed it problematic or unattractive;

- sending dancers home who were too drunk, missed stage sets, or showed a bad attitude, among other reasons;

- giving feedback to dancers about their job performance, advising them how to dance, advising them how to approach and interact with customers, and reminding them about clothes-removal rules;

- requesting that dancers perform extra stage sets;

- telling dancers to change clothing and footwear if they do not comply with club policy or even if they were unattractive or overly worn;

- deciding whether even to permit dancers to appear on stage; and

- ordering dancers off stage or out of a VIP performance if she believed a legal violation occurred.

[Doc. 47-1 – pp. 2–6]

### iii.    House moms made suggestions and recommendations as to the hiring and firing of other employees that were given particular weight.

House moms conduct the first stage of interviews and auditions for dancers at Cheetah, and it is only after that stage and the house mom's recommendation that a dancer at Cheetah can be hired. [Doc. 47-1 – pg. 2]

### iv.    Cheetah never argued that house moms were not managers or supervisors

***Defendant never argued that house moms were not managers or supervisors*** in their summary judgment briefing. Its arguments in the District Court focused ***solely*** on the question of voluntariness and whether the payments were permitted. **That house moms were "managers or supervisors" under the current DOL definition must be taken as an established fact for the purposes of summary judgment and this appeal**.

**b.    The FLSA's tip-sharing prohibition does not permit "voluntary" tip-sharing with managers and supervisors**

The District Court acknowledged that "FLSA rights cannot be abridged by contract or otherwise waived," quoting *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740–41, 101 S. Ct. 1437 (1981), but then brushed away that prohibition stating that it "does not mean that an employee cannot voluntarily spend her earned wages in a way she chooses." [Doc. 53 – pg. 8] That is the beginning and end of the District Court's analysis of Defendant's "voluntariness" argument. This is a woefully inadequate analysis and inevitably led to an egregiously wrong outcome that ignores the extreme power imbalances between employees and the individuals who control their income and terms of employment.

First, even if we (incorrectly) accept the premise that truly "voluntary" tip outs to managers and supervisors are OK, there was ample record evidence that Bosley and other dancers at Cheetah experienced at least some level of ***coercion to share their tips with house moms*** (and to share even more of their tips with floor managers than was strictly required). Bosley noticed that house moms gave lucrative VIP room assignments to those who tipped them well, and house moms could withhold favors like permission to leave early if they were not happy with a dancer's tip outs. [Doc. 42-7 – pp. 53–58; Doc. 47-1 – pg. 5] At the bare minimum, the District Court could not make a finding that these payments were unproblematically "voluntary" based on this record.

- 17 -

More importantly though, voluntariness is simply not a permissible basis to disregard Congress' clear prohibition in 29 U.S.C. § 203(m)(2)(B) from sharing tips with managers and supervisors, whether or not the employer or employee consider the arrangement to be "voluntary." As Courts have repeatedly and unambiguously held for decade after decade, the Act applies even "to those who would decline its protections." *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 302, 105 S. Ct. 1953, 1962 (1985). As the Supreme Court long ago realized, "[i]f an exception to the Act were carved out for employees willing to testify that they performed work "voluntarily," employers might be able to use superior bargaining power to coerce employees to . . . waive their protections under the Act." *Id.* (citing *Barrentine*, 450 U.S. 728, 101 S. Ct. 1437 (1981); *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 65 S. Ct. 895 (1945). Even if Bosley wanted to waive the FLSA's prohibition on tip sharing with managers and supervisors, she was not permitted to do so.

### c.    Cheetah had knowledge of and "allowed" the prohibited tip-sharing arrangement

In its summary judgment Order, the District Court found that Plaintiffs had not shown that Cheetah "allowed" the prohibited tip sharing arrangement, despite that fact that ***no such argument had been made by Defendant at summary judgment***. [Doc. 53 – pp. 9–10]

In their Motion for Reconsideration, Plaintiffs pointed out the fact that under the FLSA employers are imputed to have the knowledge of their managerial employees, and that employers have a *duty to inquire* into how their own businesses are operated. [Doc. 56 – pp. 6–7] *See Sidell v. MedMark Servs. Inc*., No. 2:16-cv-176-RWS, 2017 U.S. Dist. LEXIS 220486, 2017 WL 6994574, at *5 (N.D. Ga. Aug. 3, 2017) ("Knowledge by supervisors . . . is typically imputed to the employer."); *see also Brennan v. Gen. Motors Acceptance Corp*., 482 F.2d 825, 827-28 (5th Cir. 1973); *Reich v. Department of Conservation & Natural Resources*, 28 F.3d 1076, 1082 (11th Cir. 1994) ("an employer's knowledge is measured in accordance with his 'duty . . . to inquire into the conditions prevailing in his business.' " (quoting *Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508, 512 (5th Cir. 1969)).

The District Court distinguished away that case law because it involved the question of the number of hours worked rather than a tip-sharing arrangement. [Doc. 63 – pg. 10] But Courts have never before relieved an employer of the duty to inquire generally into its own wage and hour practices on that narrow a basis. The District Court's extremely narrow reading of the relevant case law is at odds with this Court's own broad language used in *Reich* (*i.e.*, "duty . . . to inquire into the conditions prevailing . . ."). It is also inconsistent with the way other courts have imposed a duty of inquiry on employers. *See, e.g., Gulf King Shrimp Co. v.*

*Wirtz*, 407 F.2d 508, 512 (5th Cir. 1969) (rejecting an actual knowledge requirement in the context of child labor); *see also Hellmers v. Town of Vestal*, 969 F. Supp. 837, 845 (N.D.N.Y. 1997) (explicitly adopting tort principles to the FLSA context: " 'when the employer 'should have discovered it through the exercise of reasonable diligence.' ") (quoting *Carlisle Equip. Co. v. U.S. Sec'y. of Labor & Occupational Safety*, 24 F.3d 790, 793 (6th Cir. 1994)); *Barcellona v. Tiffany English Pub, Inc*., 597 F.2d 464, 469 (5th Cir.1979) (applying duty to investigate standard to FLSA good faith analysis: "Apathetic ignorance is never the basis of a reasonable belief," and the good faith defense "requires some duty to investigate potential liability under the FLSA."). Indeed, as *Barcellona* shows, if Cheetah was actually ignorant of the tip sharing practices in place in its business, *at most* that creates a potential good faith defense to liquidated damages, not a get-out-of-jail-free card for willful blindness.

The District Court's reasoning imperils every aspect of the FLSA's employee protections because it hands a free pass to employers who bury their heads in the sand and look away from illegal wage practices that would have been obvious had any reasonable inquiry been made. Shockingly, the District Court cited the mere existence of the written tip-sharing policy purporting to prohibit mandatory or coerced tip-sharing as the basis for dismissal:

> Defendant met its burden of production for summary judgment
> because it presented evidence that its written policies prohibited

> tip sharing with house moms, as well as evidence that Plaintiff
> Bosley was aware of these policies and did not follow them.

[Doc. 63 – pp. 10–11] It is unclear what burden specifically the District Court was referring to; Defendant *never even argued* that it did not "allow" the improper tip sharing to occur.

Cheetah is a nightclub where a written rule exists, but the entire business operates in open disregard of the written rule. Cheetah has attempted—and successfully so far—to nullify the FLSA with a piece of paper, knowing that its dancers are not going to create waves by complaining to the general manager about the club's standard practices, and knowing that dancers are not going to refuse to pay the house moms when it would hamstring their own ability to earn tips. This is no different than an argument that overtime premiums need not be paid if there's a sign on the wall prohibiting overtime. The FLSA's protections are mandatory in anticipation of just such situations involving greatly unequal power. This Court cannot permit this cynical end-run around the FLSA to persist.

## 3.    The DOL's Definition of "Supervisors and Managers" is Untenable

At summary judgment, Plaintiffs argued that floor managers would also be "supervisors" if the Court would adopt a proposed modified definition of that term in 29 U.S.C. § 203(m)(2)(B). The District Court would not consider the argument and told Plaintiffs to take it to a higher court. [Doc. 53 – pp. 7–8]

### a. 29 C.F.R. § 531.52(b)(2) is an Interpretive Rule, and is not Entitled to Chevron Deference

"If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 843–44, 104 S. Ct. 2778, 2782 (1984) (citations omitted). In the case of the FLSA, however, Congress made no such explicit delegation of authority to the Department of Labor to define the statutory terms "supervisor" and "manager" used in 29 U.S.C. 203(m)(2)(B). *Cf.* 29 U.S.C. § 203(l) ("Oppressive child labor" means a condition of employment . . . in an occupation other than manufacturing or mining ***or an occupation found by the Secretary of Labor to be particularly hazardous*** for the employment of children.") (emphasis added). In 29 U.S.C. § 203(m), Congress used the terms "supervisor" and "manager," which were not previously defined terms, and determined that neither category of employee may share in the tips of other employees. 29 U.S.C. 203(m)(B). Congress made no explicit—or even implied—delegation of authority to the Department of Labor to define those terms.

Thus, 29 C.F.R. § 531.52(b)(2) is merely a statement of the Department's enforcement and adjudicatory "interpretation" of 29 U.S.C. § 203(m)(2)(B), rather than a legislative "regulation" made pursuant to Congressional grant of rule-making authority. *See, e.g., Monahan v. Cty. of Chesterfield*, 95 F.3d 1263, 1272 n.10 (4th Cir. 1996) (distinguishing Section 778 of Chapter 29 of the Code of

Federal Regulations, which merely constitute the Department's enforcement "interpretations," from "regulations" constituting binding law). As such, the interpretive rule is not entitled to any particular weight:

> The statute contains no definition of regular rate of pay and no rule for its determination. . . . As no authority was given any agency to establish regulations, courts must apply the statute to this situation without the benefit of binding interpretations within the scope of the Act by an administrative agency.

*Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 460–61 (1948).

### b. The Department of Labor's Interpretive Rule Defining "Supervisors or Managers" is Untenable and Should be Rejected

Even if the Court finds that 29 C.F.R. § 531.52(b)(2) is a regulation and entitled to deference, there is still a question as to whether the Department's definition should be deemed controlling.

First, courts must ask, "has [Congress] directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842, 104 S. Ct. 2778 (1984). If Congress's intent is clear, then that is the end of the inquiry and Congressional intent controls. *Id.* at 842–43. If, however, "the statute is silent or ambiguous," then the court must proceed to ask if the agency's action is "based on a permissible construction of the statute." *Id.* at 843. The agency's construction is not entitled to controlling weight if it is "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844.

Section 203(m)(2)(B), like section (m) before the 2018 amendment, is "clear and unambiguous, leaving no room for agency interpretation." *Aguila v. Corp. Caterers II, Inc.*, 199 F. Supp. 3d 1358, 1361 (S.D. Fla. 2016). Supervisors are supervisors and managers are managers. By adopting the conjunctive duties test from the Executive Exemption to define both "supervisor" and "manager," the Department of Labor has introduced enormous inconsistency into what was a very clear statement from Congress, and has ensured that the prohibition on tip sharing in 29 U.S.C. § 203(m)(2)(B) will not be applied to almost anyone who would commonly be referred to as a "supervisor," as well as many employees with primarily managerial duties. The Department's definition undermines congressional intent and thus must be rejected.[2]

First, the conjunctive test adopted by the Department uses **the exact same definition for both "manager" and "supervisor,"** eliminating any distinction

---

[2] Plaintiffs would point the Court to a contrary holding by the Eastern District of Virginia in the unpublished *Hoffman v. Bear Chase Brewing Co., LLC*, Civil Action No. 1:21-cv-1443, 2023 U.S. Dist. LEXIS 36146, at *8 (E.D. Va. Mar. 3, 2023). There, the District Court found the terms to be ambiguous, but did so by pointing to only *possible* ambiguities that could occur only in the most marginal and unusual circumstances, and by using only the most narrow, and terse definitions of manager and supervisor it could find, ignoring the more extensive definitions of the verbs "manage" and supervise" that can also be found in legal and other dictionaries. Moreover, that court's decision was not dispositive of the case, and it ultimately settled, preventing appellate review. *Hoffman* is wholly unpersuasive and furthermore does not address the host of problems with the Department's definition that Plaintiffs address below.

between the two positions, despite their having very distinct meanings in common usage:

- "Managers and supervisors are both positions of leadership in an organization. Managers typically play a more strategic role in a company, making decisions, setting goals and overseeing the success of a team while supervisors are responsible for administering tasks and ensuring they are done properly and on time." Indeed Editorial Team, "Manager vs. Supervisor: What's the Difference?," April 3, 2020, https://www.indeed.com/career-advice/career-development/manager-vs-supervisor (last accessed March 13, 2024).

- "[A] manager is responsible for making significant decisions on what the unit does: its purpose, functions and role, and for making commitments and decisions that require the expenditure of significant unit resources. Managers have a significant, external focus (to the world outside the unit), whereas a supervisor has a more internal focused responsibility for implementing the manager's decisions through the work of subordinate employees. Once a decision is made on what to do, supervisors have a significant role in deciding how to do it; how to achieve the objective established by the manager. . . ." UC Berkeley Administration, "What's the difference between a supervisor and a manager?," https://hr.berkeley.edu/node/3818 (last accessed March 13, 2024).

The Department of Labor's chosen single definition of "supervisor" and "manager" annihilates this dichotomy, ignoring the clear intention of Congress that two separate categories of higher-level employees were prohibited from taking a portion of lower-level employees' tips.

Even more astonishingly, in requiring that employees excluded from tip pools by Section 3(m)(2)(B) have "a primary duty [of] management" and "have the authority to hire or fire," the Department would require a supervisor to have

managerial responsibilities, utterly ignoring Congress' clear intention of excluding mere supervisors from tip pooling arrangements. What is more, employees who unquestionably "direct the work of two or more employees" would be excluded from the meaning of supervisor, simply because they are not also managers!

This outcome is almost as "perverse" (in the words of Scalia and Garner) as when the Kansas Supreme Court held that roosters were not "animals," and that a law prohibiting mistreatment of "animals" did not apply to cockfighting. *See State ex rel. Miller v. Claiborne*, 505 P.2d 732, 733 (Kan. 1973). No supervisors (as that term is universally used) will *ever* be excluded from tip-sharing if the Department's preferred definition is permitted to stand. The Court should instead follow the Appeals Court of Massachusetts' example in adopting the "broad definition, which accords with most dictionary meanings," and holding that goldfish are animals because [t]he word 'animal, in its common acceptation, includes all irrational beings." *Knox v. Mass. Soc'y for Prevention of Cruelty to Animals*, 425 N.E.2d 393, 396 (1981) (quotation omitted)). This approach ensures that the plain meaning of Congress' words are given their full effect and normal meaning, and it avoids creating a surplusage out of the word "supervisor." *See Kungys v. United States*, 485 U.S. 759, 778 (1988) (Scalia, J., plurality opinion) (calling it a "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant.").

### c. *The Department of Labor's Conjunctive Test Should be Replaced with a Disjunctive Version of the Same Test*

There is some merit in the Department of Labor's reliance upon categories already established in the interpretation of the FLSA for the purpose of defining the new terms "supervisor" and "manager." Such an approach allows both employers and courts to engage in analysis that is already familiar to them, avoiding the need to create entirely new interpretive categories. But the convenience of relying on those already established categories cannot justify adopting them in a manner that undermines congressional intent and ignores other salient factors.

With this in mind, Plaintiffs propose that this Court adopt a definition of "supervisor or manager" as used in Section 3(m)(2)(B) based on a **disjunctive version of the executive exemption duties test**. Under this familiar rubric, a manager or supervisor would be any employee who fulfills *any of the three categories* of duties enumerated in 29 C.F.R. § 541.100(a)(2)–(4), with ***managers*** being those employees with the primary duty of management (described in 29 C.F.R. § 541.102) or with the authority to hire, fire, or give suggestions and recommendations as to the same, and with ***supervisors*** being those employees who customarily and regularly direct the work of two or more other employees.

This disjunctive test has the same benefit of adopting categories that are already familiar to employers and to courts, but avoiding the disregard for congressional

intent and the plain meaning of words that the Department's current rule requires. This is surely an outcome that is far more consistent with Congress' expressed intent and the plain language of Section 3(m)(2)(B): an unqualified prohibition on tip-sharing with managers and supervisors.

Under this disjunctive test, it is clear that Cheetah's floor managers also qualify as "supervisors" (or even "managers") who are prohibited from taking a portion of the tips of the employees over whom they exercise significant authority. Floor managers had numerous primary duties that typify "managerial" work, including but not limited to handling complaints and grievances; disciplining dancers; and, most significantly, providing for the business' safety and security and monitoring legal compliance measures. *See* 29 C.F.R. § 541.102. Floor managers also directed the work of the dozens of exotic dancers that perform at Cheetah each night when they monitored their stage performances and attire (going so far as directing dancers to leave the stage if their performance or clothing was inappropriate) and resolved disputes with customers or other dancers (even ordering dancers to go to work in a specific portion of the club).

This Court should fulfill Congress' intention of prevent employees from taking tips from lower-level employees over whom they exercise authority. It can do this by adopting the proposed disjunctive test, giving the words "manager" and "supervisor" something approaching their normal meaning, and by finding that

Defendant violated the FLSA with respect to both house moms and floor managers.

**4.     Conclusion**

Based on the foregoing, Plaintiffs–Appellants respectfully request that the Court find that Cheetah violated the FLSA by allowing house moms and floor managers to take Plaintiff Bosley's tips, reject and replace the DOL's interpretive rule defining "supervisors or managers," and remand this case to the District Court for trial.

Respectfully submitted this 13th day of March 2024,

D**E**L**ONG** C**ALDWELL** B**RIDGERS**
F**ITZPATRICK** & B**ENJAMIN**, LLC

| | |
|---|---|
| 101 Marietta Street NW | *s/ Matthew W. Herrington* |
| Suite 2650 | Matthew W. Herrington |
| Atlanta, Georgia 30303 | Georgia Bar No. 275411 |
| Phone: (404) 979-3150 | Charles R. Bridgers |
| Fax: (404) 979-3170 | Georgia Bar No. 090791 |
| benjamin@dcbflegal.com | |
| matthew.herrington@dcbflegal.com | |

**Certificate of Compliance with F.R.A.P. RULE 32(A)(7)**

The undersigned counsel certifies that the foregoing brief complies with the

type-volume limitation of Fed. R. App. P. 32(a)(7)(B). It contains 6,401 words,

excluding the parts exempted by 11th Cir. R. 32-4.

Dated: March 13, 2024

*s/Matthew W. Herrington*
Matthew W. Herrington
Ga. Bar No. 275411

**Certificate of Service**

I hereby certify that I have this day electronically filed the foregoing document using the Court's CM/ECF system, which will automatically send email notification of such filing to all counsel of record.

Dated: March 13, 2024

*s/Matthew W. Herrington*
Matthew W. Herrington
Ga. Bar No. 275411