**APPEAL NO. 23-14225**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

TAMARA OGIER, Trustee for the Bankruptcy Estate of Brittany Dakota Bosley,
Case No. 20-70664-SMS, and BRITTANY DAKOTA BOSLEY,

Appellants/Cross-Appellees,

v.

INTERNATIONAL FOLLIES, INC. D/B/A CHEETAH,

Appellee/Cross-Appellant.

---

APPEAL FROM UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION
Civil Action File No. 1:21-cv-2421-VMC

---

**INTERNATIONAL FOLLIES, INC. D/B/A CHEETAH'S
APPELLEE RESPONSE TO APPELLANTS' PRINCIPAL BRIEF
AND CROSS-APPELLANT'S PRINCIPAL BRIEF**

Andrea L. Pawlak
Schulten Ward Turner & Weiss, LLP
260 Peachtree Street, N.W., Suite 2700
Atlanta, Georgia 30303
404-688-6800 (Phone)
404-688-6807 (Direct)
404-688-6840 (Fax)
a.pawlak@swtwlaw.com

*Counsel for Appellee/Cross-Appellant
International Follies, Inc. d/b/a Cheetah*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Appellee/Cross-Appellant International Follies, Inc. d/b/a Cheetah ("Cheetah") filed its Certificate of Interested Persons and Corporate Disclosure Statement ("Certificate") on January 12, 2024 and herein provides same as follows:

A. Trial Judges:

The Honorable Victoria Marie Calvert

B.   All attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, including any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party.

Bosley, Brittany Dakota - *Appellant/Cross-Appellee*

Bridgers, Charles R. - *Counsel for Appellant/Cross-Appellee*

DeLong, Caldwell, Bridgers, Fitzpatrick & Benjamin, LLC - *Counsel for Appellant/Cross-Appellee*

Herrington, Matthew W. - *Counsel for Appellant/Cross-Appellee*

International Follies, Inc. d/b/a Cheetah - *Appellee/Cross-Appellant*

Ogier, Tamara, Trustee for the Bankruptcy Estate of Brittany Dakota Bosley, Case No. 20-70664-SMS - *Appellant/Cross-Appellee*

Pawlak, Andrea L. - *Counsel for Appellee/Cross-Appellant*

i

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellee/Cross-Appellant International Follies, Inc. d/b/a Cheetah does not request oral argument as this Honorable Court may determine the issues on appeal from the briefing.

The argument by Tamara Ogier, Trustee for the Bankruptcy Estate of Brittany Dakota Bosley, Case No. 20-70664-SMS ("Trustee") and Brittany Dakota Bosley ("Bosley") (together herein, "Plaintiffs") that this is a matter of "first impression" is misleading. While the Department of Labor's regulatory definition set forth in 29 C.F.R. § 531.52(b)(2) that follows the duties test set forth in 29 U.S.C. § 541.100(a)(2)-(4) to determine "managers or supervisors" under 29 U.S.C. § 203(m)(2)(B) is at issue, that duties test has been part of the FLSA vernacular for a long time. It is not a novel issue. Even Plaintiffs describe it as "familiar" to employers and courts. Pls' Br., p. 36.

## **TABLE OF CONTENTS**

Certificate of Interested Persons and Corporate Disclosure Statement…    i

Statement Regarding Oral Argument……………………………………...    ii

Table of Citations……………………………………………………….    v

Statement of Jurisdiction………………………………………………..    x

I. Statement of the Issues for Review…………………………………...    1

II. Statement of the Case………………………………………………..    1

    A. Introduction…………………………………………………………    1

    B. Procedural History and Rulings Presented for Review…………..    2

    C. Statement of Facts……………………………………………...    4

        *1. Undisputed Material Facts……………………………………*    4

        *2. Bosley's Declaration should be disregarded…………………*    10

    D. Statement of Standard of Review………………………………..    11

III. Summary of the Argument…………………………………………    13

IV. Argument and Citations of Authority………………………………    14

    A.   CHEETAH DID NOT "KEEP" BOSLEY'S TIPS BY ALLOWING TIPPING TO HOUSE MOMS OR BOUNCERS OUTSIDE OF THE TIP POOL; TO THE CONTRARY, CHEETAH EXPRESSLY PROHIBITED TIPPING OUTSIDE OF THE TIP POOL. ………………………………………..    14

    B.   THIS COURT SHOULD *NOT* DISREGARD THE DOL DEFINITION OF "MANAGERS OR SUPERVISORS" IN FAVOR OF PLAINTIFFS' "PROPOSED MODIFIED DEFINITION." ………………………………………..    23

1. The Duties Test Set Forth in 29 C.F.R. § 541.100(a)(2)-(4)….    23

2. *Chevron* Deference to the DOL Regulation…………………..    26

3. Plaintiffs' Self-Serving Proposed Definition………………….    31

C. THIS COURT SHOULD REVERSE THE DENIAL OF
    CHEETAH'S MOTION FOR SANCTIONS…………………..    32

V. CONCLUSION…………………………………………………    35

CERTIFICATE OF COMPLIANCE AND SERVICE…………………    36

# <u>TABLE OF CITATIONS</u>

## Cases

<u>Aguila v. Corp. Caterers II, Inc.</u>, 199 F. Supp. 3d 1358 (S.D. Fla. 2016)……………………………………………………...    30

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986)……….    12

<u>Barcellona v. Tiffany Eng. Pub, Inc.</u>, 597 F.2d 464 (5th Cir. 1979)…………………………………………………..    23

<u>Barrentine v. Arkansas-Best Freight Sys., Inc.</u>, 450 U.S. 728 (1981)………………………………………………….    21, 22

<u>Blue Mountain Holdings Ltd. v. Bliss Nutraceticals, LLC</u>, 2022 WL 4130752 *1 (N.D. Ga. Sept. 12, 2022)………………    22

<u>Brennan v. Gen. Motors Acceptance Corp.</u>, 482 F.2d 825 (5th Cir. 1973)………………………………………………...    23

<u>Bridge v. Phoenix Bond & Indem. Co.</u>, 553 U.S. 639 (2008)…..    12

<u>Brooklyn Savings Bank v. O'Neil</u>, 324 U.S. 697 (1945)………    21

<u>Carts v. Wings Over Happy Valley MDF, LLC</u>, 2023 WL 373175, at *7 (M.D. Pa. Jan. 24, 2023)………………………..    16

<u>Cascabel Cattle Co., L.L.C. v. United States</u>, 955 F.3d 445 (5th Cir. 2020)………………………………………………...    31

<u>*Chevron, U.S.A., Inc. v. NRDC, Inc.</u>, 467 U.S. 837 (1984)…..    3, 13, 26, 28, 29, 31

<u>Citizens to Pres. Overton Park, Inc. v. Volpe</u>, 401 U.S. 402 (1971)…………………………………………………..    12

<u>Cooter & Gell v. Hartmarx Corp.</u>, 496 U.S. 384 (1990)………..    12

<u>Crittendon v. Int'l Follies, Inc.</u>, 2021 WL 9274510, *1 (N.D. Ga. July    32-33

7, 2021)……………………………………………….

Devillaz v. Atmosphere Gastropub, Inc., 2023 WL 3486611, at *4–5
(D. Colo. May 15, 2023)…………………………………. 25

Diaz v. First Marblehead Corp., 643 Fed. Appx. 916 (11th Cir.
2016)………………………………………………………… 33-34

Duren v. Int'l Follies, Inc., 2021 WL 9274495, at *1 (N.D. Ga. July
12, 2021)………………………………………………….. 33

Encino Motorcars, LLC v. Navarro, 579 U.S. 211 (2016)…….. 26

Falken v. Glynn Cnty., Georgia, 197 F.3d 1341 (11th Cir. 1999). 28

Gulf King Shrimp Co. v. Wirtz, 407 F.2d 508 (5th Cir. 1969)….. 23

Helix Energy Sols. Grp., Inc. v. Hewitt, 598 U.S. 39 (2023)…… 32

Hellmers v. Town of Vestal, N.Y., 969 F. Supp. 837 (N.D.N.Y.
1997)………………………………………………………. 23

Hetherington v. Wal-Mart, Inc., 511 F. App'x 909 (11th Cir.
2013)………………………………………………………... 11

Hoffman v. Bear Chase Brewing Co., LLC, 2023 WL 2352926, at
*1, *3 (E.D. Va. Mar. 3, 2023)………………………………… 30

Huggins v. Lueder, Larkin & Hunter, LLC, 39 F.4th 1342 (11th Cir.
2022)………………………………………………………… 34

Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292
(11th Cir. 2011)………………………………………….. 28

Kimemiah v. Sun Valley Tech Sols., Inc., 2016 WL 7438018, *1, *4
(N.D. Ga. Jan. 8, 2016)…………………………………….. 11

*Kubiak v. S.W. Cowboy, Inc., 164 F. Supp. 3d 1344 (M.D. Fla.
2016)………………………………………………………. 17, 21

Landmark Infrastructure Holding Co. LLC v. N. Georgia Speculators, LLC, 2021 WL 5171487, at *1 (N.D. Ga. Oct. 7, 2021)……………………………………………………………… 22

LeBlanc v. Unifund CCR Partners, 601 F.3d 1185 (11th Cir. 2010)… 12

Leigh v. Warner Bros., Inc., 212 F.3d 1210 (11th Cir. 2000)………... 10

Llorca v. Sheriff, Collier Cty., Fla., 893 F.3d 1319 (11th Cir. 2018).. 12

Lockett v. Pinnacle Ent., Inc., 2021 WL 960424, *1, *6 (W.D. Mo. Mar. 12, 2021)……………………………………………………. 16-17

Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158 (2007)………. 26, 27-28, 29

Longleaf in Vinings Homeowners Association, Inc. v. QBE Ins. Corp., 2015 WL 11232360, *1, *6 (N.D. Ga. Mar. 12, 2015)……….. 11

Lopez v. City of W. Miami, 662 F. App'x 733 (11th Cir. 2016)…….. 22

Maust v. United Parcel Serv. Gen. Servs. Co., 2012 WL 4327047, *1, *4 (N.D. Ga. Sept. 14, 2012)…………………………………………. 12

Mays v. Int'l Follies, Inc., 2020 WL 13573506, at *1 (N.D. Ga. Sept. 25, 2020)…………………………………………………………….. 32

Mayweather v. CVSM, LLC, 2023 WL 3852098, at *5 (D. Nev. June 5, 2023)……………………………………………………………… 18, 25

Monahan v. Cnty. of Chesterfield, Va., 95 F.3d 1263 (4th Cir. 1996).. 27

Murphy v. Martin, 190 F. App'x 764 (11th Cir. 2006)………………. 11

Pelletier v. Zweifel, 921 F.2d 1465 (11th Cir. 1991)………………… 12

Reich v. Dep't of Conservation & Nat. Res., State of Ala., 28 F.3d 1076, 1082 (11th Cir. 1994)………………………………………….    23

Rest. L. Ctr. v. United States Dep't of Lab., 2023 WL 4375518, at *9 (W.D. Tex. July 6, 2023)…………………………………………..    12, 28

Rodriguez v. Pure Beauty Farms, Inc., 503 F. App'x 772, 775 (11th Cir. 2013)…………………………………………………………..    28

Roussell v. Brinker Int'l, Inc., 441 F. App'x 222 (5th Cir. 2011)…….    16

Scalia v. Sofia & Gicelle, Inc., 2020 WL 7828770, at *9 (D. Md. Dec. 30, 2020)…………………………………………………………..    17

Sidell v. MedMark, 2017 WL 6994574, *1, *5 (N.D. Ga. 2017)……..    22

Smith v. Owens, 848 F.3d 975, 978 (11th Cir. 2017)………………...    11

Tony & Susan Alamo Found. v. Sec'y of Lab., 471 U.S. 290 (1985)..    21

Van T. Junkins & Assoc, Inc. v. U.S. Indus., Inc., 736 F.2d 656 (11th Cir. 1984)………………………………………………………….    11

Walsh v. Dayemi Org., Inc., 2022 WL 2291706, at *4 (S.D. Ill. June 24, 2022)…………………………………………………………    16

Wilson v. Greater Ga. Life Ins. Co., 2015 WL 11549074, *1, *2 (N.D. Ga. May 21, 2015)………………………………………….    10

**Statutes**

Fed. R. Civ. P. 11……………………………………………….    12, 13, 14, 33-34

Fed. R. Civ. P. Rule 26(f)…………………………………………    33

Fed. R. Civ. P. 56(c)(4)…………………………………………    11

29 U.S.C. § 201 *et seq*..…………………………………………….. 1

*29 U.S.C. § 203(m)(2)(B)………………………………………….. 3, 14, 15, 17, 21, 22, 23, 24, 25, 27, 29, 30

29 U.S.C. § 204…………………………………………………... 28

**Other Authorities**

Department of Labor Field Assistance Bulletin No. 2018-3…... 23-24

Department of Labor Field Operations Handbook § 30d04(g) (December 9, 1988)…………………………………………… 16

Pub. L. 115-141 (03/23/2018)………………………………… 29

*Tip Regulations Under the Fair Labor Standards Act (FLSA), 85 FR 86756-01………………………………………………….. 17, 24-25, 32

**Rules**

11th Cir. R. 28-5………………………………………………... 4

**Regulations**

*29 C.F.R. § 531.54(b)(1)…………………………………… 15

*29 C.F.R. § 531.52(b)(2)…………………………………… 3, 24, 26, 27

*29 C.F.R. § 541.100(a)……………………………………… 3, 23, 24-25, 32

29 C.F.R. § 778.1………………………………………………… 27

29 C.F.R. § 778………………………………………………... 27

## STATEMENT OF JURISDICTION

The United States District Court, Northern District of Georgia, Atlanta Division had subject-matter jurisdiction over this matter. This Court has jurisdiction over the appeals related to the motion for summary judgment and motion for sanctions under FED. R. CIV. P. 11. 28 U.S.C. §§ 1291, 1294. This appeal was filed in accordance with FED. R. APP. P., including Rules 3 and 4(a).

However, Cheetah does submit that this Court may not have subject matter jurisdiction over Plaintiffs' request that the Court replace the Department of Labor's regulatory definition of "managers or supervisors" with a proposed definition crafted by Plaintiffs. See, e.g., Auer v. Robbins, 519 U.S. 452, 459, 117 S. Ct. 905, 910, 137 L. Ed. 2d 79 (1997) ("The proper procedure for pursuit of respondents' grievance is set forth explicitly in the APA: a petition to the agency for rulemaking, § 553(e), denial of which must be justified by a statement of reasons, § 555(e), and can be appealed to the courts, §§ 702, 706.").

## I.  STATEMENT OF THE ISSUES FOR REVIEW

Plaintiffs have enumerated four (4) purported issues for review in their Principal Brief ("Pls' Br."). Cheetah states that the following issues are presented for review as to its cross-appeal:

(1)    Whether the District Court erred in denying Cheetah's Motion for Sanctions on the grounds that it was untimely and on the merits?

(2)    Whether Cheetah should be awarded sanctions in the amount of its attorney fees and expenses against Plaintiffs' counsel and/or Trustee (not Bosley, individually)?

## II.  STATEMENT OF THE CASE

### A.    Introduction

Bosley was an adult entertainer (dancer) at Cheetah from late 2019 until early 2022. Plaintiffs concede that Bosley made at least the minimum wage. Plaintiffs also concede that Bosley had notice of Cheetah's use of the tip credit under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA") and had notice of the tip pool to which dancers contribute 10% of their tips to be divided between bouncers[1]

---

[1] A bouncer at Cheetah is also called a floorman. [Doc. 42-7, pp. 72-73, 115-116]. A label or title does not determine job duties, roles, or positions under the FLSA. Bosley testified that bouncers and floormen (and floor manager) are the same, but she referred to them as bouncers along with "everyone at the club . . . like all the employees." [Doc. 42-7, pp. 115-116].

and disc jockeys. Plaintiffs further concede that the disc jockeys were properly included in the tip pool.[2] Although Plaintiffs initially argued that bouncers were not customarily and regularly tipped, they have abandoned that argument as well. Plaintiffs also previously conceded that bouncers do not meet the current definition of "managers or supervisors" that are barred from participating in a tip pool. [Doc. 47, pp. 14-15]. Instead, Plaintiffs argue that: (1) tips Bosley paid or purportedly paid to bouncers and house moms *outside* of the tip pool violated the FLSA[3] and (2) the Court should supplant the DOL's regulatory definition of "managers or supervisors" with a self-serving and practically limitless definition crafted by Plaintiffs to find that bouncers should not have been included in the tip pool.

## B.    Procedural History and Rulings Presented for Review

On June 14, 2021, Trustee filed the lawsuit against Cheetah [Doc. 1]; Bosley was added as a plaintiff on December 17, 2021 [Doc. 29]. Cheetah answered on July 2, 2021 and served a copy of a motion for sanctions on October 26, 2021 pursuant to the safe harbor provision of Rule 11.

Cheetah moved for summary judgment on May 20, 2022 after the close of discovery. [Doc. 42]. Along with its motion, Cheetah submitted its statement of

---

[2] [Doc. 42-7, pp. 6-8].

[3] Plaintiffs' counsel confirmed that: "[T]here is no tip pooling allegation in this case. So there's been no allegation that the house moms were participating in a tip pool." [Doc. 42-7, p. 92].

2

material facts and supporting exhibits, including the deposition of Bosley and declarations from six (6) bouncers and three (3) house moms. [Doc. 42-6]. Plaintiffs submitted an untimely response on June 21, 2022 [Doc. 47]; [Docs. 43 & 44]. Cheetah filed a reply brief [Doc. 48] and objected and responded to the statement of alleged disputed facts submitted by Plaintiffs [Doc. 49] on July 5, 2022.

On March 27, 2023, the District Court entered its Order [Doc. 53] granting summary judgment to Cheetah (the "Order"). In the Order, the District Court found that house moms were excluded from the tip pool, that voluntary tipping was not prohibited, and that Plaintiffs' contentions "that house moms began recommending customers to her after she got on their good side by tipping them well . . . fall far short of Defendant 'allowing' the house moms 'to keep any portion of employees' tips' in violation of 29 U.S.C. § 203(m)(2)(B)." [Doc. 53, pp. 8-10]. In addition, the District Court held that "'[f]or purposes of section 3(m)(2)(B), the term 'manager' or 'supervisor' shall mean any employee whose duties match those of an executive employee as described in § 541.100(a)(2) through (4) . . . of this chapter. . . .' 29 C.F.R. § 531.52(b)(2) (the "Regulation")." [Doc. 53, pp. 6-7]. The District Court explained that the Eleventh Circuit affords the DOL's regulations <u>Chevron</u> deference. <u>Id.</u> at p. 7. Because bouncers did not fall within the definition set forth in the Regulation, they were properly included in Cheetah's tip pool. <u>Id.</u> at pp. 6-8.

Four days after entry of the Order, on March 31, 2023, Cheetah moved for

sanctions pursuant to Rule 11 [Doc. 55], seeking attorney fees and expenses against Trustee and Plaintiffs' counsel (not against Bosley). On April 3, 2023, Plaintiffs moved for reconsideration of the Order, asking the District Cout to reconsider its summary judgment ruling. [Doc. 56]. On December 21, 2023, the Court denied both motions. [Doc. 63] ("Final Order"). On December 26, 2023, Plaintiffs noticed an appeal regarding the motion for reconsideration; Cheetah filed its cross notice of appeal regarding the motion for sanctions on January 9, 2024.

**C.    Statement of Facts**

*1.    Undisputed Material Facts.*

The Cheetah is an upscale adult entertainment club in Atlanta, Georgia with female dancers. [Docs. 42-8 through 42-13] (collectively "Bouncer Declarations"). Bosley worked at Cheetah as a dancer from November 8, 2019 through March 18, 2020 (COVID-19 closure) then from June 8, 2020 until February 3, 2022. [Doc. 42-7], [Doc. 42-7 (Bosley Tr.), pp. 193-206]; [Doc. 42-7, pp. 10, 11, 32-50].[4] Bosley was paid $2.13 per hour plus tips. [Doc. 42-7, pp. 11-12]. Cheetah "used a tip credit to make up the difference between the hourly wage and the minimum wage under the tip credit provisions of the FLSA." [Doc. 42-7, p. 197 (Notice of Tip Credit)]; see also [Doc. 30] (First Amended Complaint), ¶ 15.

---

[4] "The page number . . . is the page number that appears in the header generated by the district court's electronic filing system" in accordance with 11th Cir. R. 28-5.

Bosley signed the Notice of Tip Credit, [Doc. 42-7, p. 197], which she acknowledges reflects her "agreeing to the hourly rate as long as [she makes] make enough tips to make at least the federal minimum wage. **And then it's also saying that all of [her tips that she is] to keep, other than what we give back to the tip pool for whoever receives tips**." [Doc. 42-7, p. 35] (emphasis added). Bosley stipulated that "her tips always exceeded the federal minimum wage and [does] not claim that she had improper notice of tip credit." [Doc. 42-7, p. 36].

**Tip Pool:** When hired, Bosley received the Entertainer Employee Policies ("Policies") and signed an Acknowledgment of Receipt of the Policies. [Doc. 42-7, pp. 47, 50-51, 198, 207-212]. Bosley "read it probably half a dozen times," including after her first day at Cheetah. Id. at pp. 51, 73-74. The Policies provide that:

> Entertainers are required to contribute to the floor managers and disc jockeys, collectively, ten percent (10%) of their total tips as part of a tip-pooling arrangement. **There is no other mandatory tipping.** With the exception of any lawful contributions to a tip pool that you may be required to make, the applicable law requires that you be allowed to retain all of your remaining tips. **Management will not retain any of your tips.**

[Doc. 42-7, p. 208 ("Tip-Out")] (emphasis added); [Doc. 42-7, pp. 51-52, 110-112]; [Docs. 42-8 through 42-13, ¶ 6]; see also [Doc. 42-7, p. 197] ("All tips you receive will be retained by you, except for any valid tip pooling arrangement limited to employees who customarily and regularly receive tips."). The Policies do not provide for any participation in the tip pool by house moms. [Doc. 42-7, p. 73]. During day shifts, the entire 10% tip pool went to the disc jockey. [Doc. 42-7, pp.

28, 39]. During night shifts, the bouncers received 50% of the tip pool, and the disc jockey received 50% of the tip pool. [Docs. 42-8 through 42-13, ¶ 6].

With respect to the tip pool, Bosley testified that she "always tip[s]-out to one of the bouncers" to contribute to the tip pool [Doc. 42-7, pp. 37-38];[5] see also [Docs. 42-8 through 42-13, ¶ 6]. Bosley has never seen a bouncer count the tip pool. [Doc. 42-7, p. 41]. She has never seen the bouncer pass out money to anybody else from the tip pool. Id. Once Bosley handed the bouncer her contribution to the tip pool, "in actuality it became a part of the tip pool money." [Doc. 42-7, p. 43].

Bouncers were properly included in the tip pool. [Docs. 42-8 through 42-13]. The bouncers at Cheetah do not have any supervisory or managerial duties or responsibilities and are not the managers or supervisors of the dancers. Id. at ¶¶ 4, 7, and 8. Bouncers at Cheetah do not have the authority to hire, fire, or discipline anyone at Cheetah. Id. at ¶ 7. They have no control over any other employee of Cheetah. Id.; see also [Doc. 42-7, pp. 18-19] (Bosley not aware of who oversees billing or makes decisions about employee pay, other than the owners.). They do not participate in interviews or auditions and do not provide input or feedback regarding the hiring of dancers. [Docs. 42-8 through 42-13, ¶ 10]; [Doc. 42-7, pp. 19-20]. Likewise, bouncers do not have authority to fire a dancer. [Docs. 42-8 through 42-

---

[5] Because there is not a bouncer on day shift, Bosley tipped out to the disc jockey during her day shifts. [Doc. 42-7, pp. 28, 39].

13, ¶ 11]; [Doc. 42-7, pp. 27-28] ("I don't know who made the final call [to fire], as I wasn't there."). According to Bosley, "[b]ouncers don't have as much rule." [Doc. 42-7, p. 27]; [Docs. 42-8 through 42-13, ¶ 9].

**Voluntary Tips:** Any tips Bosley gave to house moms or to bouncers outside of the tip pool were made voluntarily. [Doc. 42-7, pp. 53-54].

At Cheetah, house moms help the dancers get ready or if they need something. [Doc. 42-14, p. 3, ¶ 4]; [Doc. 42-15, pp. 2-3, ¶ 4]; [Doc. 42-16, pp. 2-3, ¶ 4]. No one at Cheetah has to tip house moms. Id. at ¶¶ 5-7. Cheetah's owners and managers have never required, requested, or otherwise implied that anyone (including dancers) has to tip or share her tips with house moms. Id. at ¶ 8. None of the house moms have forced, coerced, harassed, or intimated anyone (including dancers) into tipping them. [Doc. 42-14, pp. 3-4, ¶ 9]; [Doc. 42-15, pp. 3, ¶ 9]; [Doc. 42-16, pp. 3, ¶ 9]. The house moms have never told anyone, including dancers, that they have to or should tip them, and they have never said or suggested to anyone, including a dancer, that she will not be able to have days off (miss work) and/or leave work early if she does not tip them. Id. To the contrary, the house moms have regularly and consistently told dancers they do *not* have to tip house moms. Id. To the extent that anyone, including dancers, tip house moms, they do so voluntarily. Id. at ¶ 10.

Bosley *chose* to tip house moms "[w]hen they would help [her] pick an outfit or would give [her] advice, things like that, [she] would definitely tip them because

they're helping [her]. And it just feels nice and such." [Doc. 42-7, pp. 78-79, 95].

Bosley *chose* to tip house moms for *perceived* benefits to herself such as leaving early or missing work. [Doc. 30, ¶ 28]; [Doc. 42-7, pp. 53-54, 57-58, 95-98] ("I could take mental health days"). Cheetah did not benefit from dancers leaving early or missing work. Id. at pp. 59-60.

According to Bosley, between three (3) to five (5) times during the time that she worked at Cheetah, a house mom recommended her to a customer looking for a VIP dancer. [Doc. 42-7, pp. 58, 96-97]. In addition, "at least once a night a bouncer would recommend [Bosley] to a VIP table." Id. at p. 54. Bosley made $400 an hour for a VIP. Id. at p. 56. However, dancers are not required to pay any amount to bouncers or anyone else for referring VIP customers to them. [Docs. 42-8 through 42-13, ¶ 14]. In fact, doing so is prohibited by Cheetah. Id. The Policies provided:

> If an entertainer feels pressured to share tips with anyone other than through the contribution to the tip pool referenced above, the entertainer must contact General Manager Jack Braglia at 404-724-2330 ext. 106 immediately. Any coercion, harassment or other actions to intimidate, blackmail or otherwise force any entertainer to share her tips with another employee will not be tolerated. . . . Any entertainer who feels she has been subjected to any coercion, harassment or other intimidating actions to force her to share their tips must contact General Manager Jack Braglia at 404-724-2330 ext. 106 immediately.

[Doc. 42-7, p. 208]; [Doc. 42-7, pp. 51-52, 110-112]. Cheetah also had a poster hanging on the bulletin board that states:

> Entertainers are **not permitted to tip anyone** including **floor managers, housemoms,** waitstaff, or any Cheetah employee, for referral or introduction to a **VIP customer**, or for recommending an entertainer to any customer for a

8

**VIP room** experience.

[Doc. 42-7, p. 401] (emphasis added); [Doc. 42-7, pp. 112-113]. Bosley saw the poster during her employment with Cheetah. [Doc. 42-7, pp. 112-113]. Yet, Bosley never spoke to Braglia (or anyone at Cheetah) regarding any issues with respect to tips or the tip pool and never reported to Braglia (or anyone else) that she was tipping for VIP referrals. [Doc. 42-7, pp. 52-53, 112, 124]; [Doc. 42-7, pp. 44, 52-54, 101-102]; [Doc. 42-7, p. 55].

Bosley's decision to tip bouncers and house moms was a violation of Cheetah's Policies. [Doc. 42-7, p. 208]; [Doc. 42-7, pp. 51-52, 110-112]. Asked, "[d]id you ever experience coercion, harassment, or intimidation regarding tips or the tip pool," Bosley said "[n]ot necessarily." [Doc. 42-7, p. 53]. Bosley "never [had] a spoken arrangement" to tip for a VIP referral. Id. at p. 54. Instead, she might tip "depending on how much [she] made from that recommendation." Id. at p. 55. Getting a referral "assist[ed] in [her] moneymaking." Id. at pp. 124-125.[6] In contrast, Cheetah did not benefit from bouncers or house moms recommending *Bosley* to a VIP. Id. at pp. 59-60, 99. Cheetah does not use a tip credit to cover the minimum wages of bouncers or house moms. [Docs. 42-8 through 42-13, ¶ 13]; [Doc. 42-14,

---

[6] Bosley could have gotten (and did get) her own VIP customers "[b]y sitting and talking to customers," but that process could be time consuming. [Doc. 42-7, pp. 99-101]. She actually "received [her] own [VIP customers] more frequently" than they were recommended to her. [Doc. 42-7, p. 100].

p. 4, ¶ 13]; [Doc. 42-15, p. 4, ¶ 13]; [Doc. 42-16, p. 4, ¶ 13].

　　2.　*Bosley's Declaration should be disregarded.*

Although Bosley was deposed, Plaintiffs rely almost exclusively on the subsequent Declaration of Brittany Dakota Bosley [Doc. 47-1] to support their alleged facts. Pls' Br., pp. 3-7 (citing same twenty-six (26) times). The Bosley Declaration is riddled with immaterial and conclusory statements to which Cheetah properly objected below. [Doc. 49].[7] In the Eleventh Circuit, "conclusory allegations" contained in a declaration "have no probative value." Wilson v. Greater Ga. Life Ins. Co., 2015 WL 11549074, *1, *2 (N.D. Ga. May 21, 2015) (citing Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000) (internal quotations omitted). Declarations must be made on personal knowledge, not legal

---

[7] Bosley claims that house moms were involved in hiring dancers, [Doc. 47-1], but she testified during her deposition that prospective dancers "go on to the stage audition [with Robert "Bob" Johnson, the general manager] and then it goes down to Bob, whether or not they get the job." [Doc. 42-7, p. 20]. Further, Bosley's claim that house moms train dancers [Doc. 47-1], is contradicted by her testimony that "the dancer that trained me" and that she "had trained" two other dancers. [Doc. 42-7, pp. 23, 39-40]. Bosley does not explain whether or how she has personal knowledge about discipline [Doc. 47-1] given her deposition testimony that other than being put on a "no-drink" list by General Manager Bob Johnson after failing a breathalyzer one night, she was never written up or disciplined in any other way at Cheetah. [Doc. 42-7, pp. 46-47]. Bosley was specifically asked, "Do you know who had final decision on discipline of the dancers?" to which she unequivocally responded, "I don't." [Doc. 42-7, p. 86]. Bosley's claim that house moms or bouncers directed her to stage sets is also contradictory to her testimony that stage rotations were based on either a color rotation or time slot at the start of a shift. [Doc. 42-7, pp. 61-62]. The list with that information was kept "[a]t the DJ's booth." Id. at p. 62.

conclusions, must "set out facts that would be admissible in evidence," and must demonstrate that the "declarant is competent to testify on the matters stated." Kimemiah v. Sun Valley Tech Sols., Inc., 2016 WL 7438018, *1, *4 (N.D. Ga. Jan. 8, 2016); Fed. R. Civ. P. 56(c)(4); Hetherington v. Wal-Mart, Inc., 511 F. App'x 909, 911 (11th Cir. 2013). "Recognizing that a party might try to avoid summary judgment by using affidavits to create issues of fact where none exist, the Eleventh Circuit allows the Court to disregard an affidavit as a 'sham' if it directly contradicts earlier deposition testimony in a manner that cannot be explained." Kimemiah, 2016 WL 7438018 at *4 (citing Van T. Junkins & Assoc, Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657-58 (11th Cir. 1984)). "[A]n affiant should state the basis for [her] personal knowledge." Longleaf in Vinings Homeowners Association, Inc. v. QBE Ins. Corp., 2015 WL 11232360, *1, *6 (N.D. Ga. Mar. 12, 2015), aff'd, 646 F. App'x 823 (11th Cir. 2016) (quotation and citation omitted).

## D.    Statement of Standard of Review

The Eleventh Circuit "review[s] a district court's decision on summary judgment de novo and appl[ies] the same legal standard used by the district court." Smith v. Owens, 848 F.3d 975, 978 (11th Cir. 2017); Murphy v. Martin, 190 F. App'x 764, 764–65 (11th Cir. 2006). Once a movant has shown that there are no genuine issues of material fact and it is entitled to judgment on the law, as Cheetah did, the non-movant must "present affirmative evidence to show that a genuine issue

of material fact does exist." <u>Maust v. United Parcel Serv. Gen. Servs. Co.</u>, 2012 WL 4327047, *1, *4 (N.D. Ga. Sept. 14, 2012); <u>see also</u> <u>LeBlanc v. Unifund CCR Partners</u>, 601 F.3d 1185, 1189 (11th Cir. 2010). "[T]he mere existence of some alleged factual dispute" will not defeat a motion for summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). Importantly, "whether a particular set of facts and circumstances is compensable under the FLSA is a question of law for the Court to decide." <u>Llorca v. Sheriff, Collier Cty., Fla.</u>, 893 F.3d 1319, 1323-24 (11th Cir. 2018).

The standard of reviewing the DOL regulation, as urged by Plaintiffs, is a "narrow" "arbitrary and capricious" standard. <u>Rest. L. Ctr. v. United States Dep't of Lab.</u>, 2023 WL 4375518, at *9 (W.D. Tex. July 6, 2023) (citing <u>Citizens to Pres. Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971)).

A District Court's denial of a Rule 11 motion is reviewed by an abuse of discretion standard. <u>Cooter & Gell v. Hartmarx Corp.</u>, 496 U.S. 384, 385-86 (1990). "If the district court based its conclusion on an erroneous view of the law, the appellate court would be justified in concluding that it had abused its discretion." <u>Id.</u>; <u>see also</u> <u>Pelletier v. Zweifel</u>, 921 F.2d 1465, 1514 (11th Cir. 1991), *abrogated on other grounds by* <u>Bridge v. Phoenix Bond & Indem. Co.</u>, 553 U.S. 639 (2008) (abuse of discretion where court did not consider whether claims were frivolous).

12

### III. SUMMARY OF THE ARGUMENT

Cheetah respectfully shows that this Honorable Court should affirm the District Court's decision to grant summary judgment to Cheetah but reverse the District Court's denial of Cheetah motion for sanctions under FED. R. CIV. P. 11 ("Rule 11"). Plaintiffs conflate the issues and push for a self-serving definition that does not exist under the FLSA.

Bosley, at all times, held onto her own tip money. No one else collected and/or distributed her tips, and this is not a "tip jar" case. Bosley paid her 10% tip pool contribution on the honor system; no one else handled, counted, took, or put her tips into the tip pool. Plaintiffs agree that the disc jockey was properly included in the tip pool.

The FLSA did not prohibit Bosley, who was paid minimum wage and contributed to a lawful tip pool, from choosing to voluntarily tip out house moms or bouncers. Cheetah did not have a policy requiring tips to house moms. In stark contrast, Cheetah's written policy and signage prohibits tipping outside of the tip pool. Cheetah did not keep Bosley's tips. What Bosley did with her money (including her tips) was her perogative.

Plaintiffs agree that bouncers were properly included in the tip pool under the current law but urge this Court to rewrite the DOL's defintion of "managers or supervisors." That argument fails. The DOL's definition is entitled to <u>Chevron</u>

deference and is completely reasonable. Plaintiffs' arguments to the contrary, which includes a heavy reliance on two (2) unauthenticated blogs about the "managers" and "supervisors," are unfounded.

Finally, for the same reasons, Cheetah should have been awarded sanctions under Rule 11. Cheetah's motion for sanctions was not untimely as the District Court found and was not based solely on prior District Court decions but, rather, on the lack of law and facts supporting Plaintiffs' allegations.

## IV.  ARGUMENT AND CITATIONS OF AUTHORITY

**A.    CHEETAH DID NOT "KEEP" BOSLEY'S TIPS BY ALLOWING TIPPING TO HOUSE MOMS OR BOUNCERS OUTSIDE OF THE TIP POOL; TO THE CONTRARY, CHEETAH EXPRESSLY PROHIBITED TIPPING OUTSIDE OF THE TIP POOL.**

Whether house moms are "managers or supervisors" is an irrelevant red herring. House moms were not included in the tip pool. Plaintiffs have conceded that: "there's been no allegation that the house moms were participating in a tip pool." [Doc. 42-7, p. 92]. Moreover, Cheetah had absolutely <u>no</u> requirement, rule, policy, or directive that dancers tip house moms outside of the tip pool, and Plaintiffs have wholly failed to provide any evidence that Cheetah did.

The language of 29 U.S.C. § 203(m)(2)(B) at issue provides that: "An employer may not **keep** tips received by its employees for any purposes, including **allowing** managers or supervisors to **keep** any portion of employees' tips, regardless of whether or not the employer takes a tip credit." (emphasis added). There is *zero*

evidence that Cheetah *kept* tips received by Bosley (or anyone else), including by "**allowing** managers or supervisors to keep any portion of employees tips." 29 U.S.C. § 203(m)(2)(B) (emphasis added). To the contrary, Cheetah's Policies strictly provide the opposite. [Doc. 42-7, pp. 208 and 401]. The DOL expressly provides:

> (1) **Meaning of "keep."** Section 3(m)(2)(B)'s prohibition against keeping tips applies regardless of whether an employer takes a tip credit. Section 3(m)(2)(B) expressly prohibits employers from **<u>requiring</u>** employees to share tips with managers or supervisors, as defined in § 531.52(b)(2), or employers, as defined in 29 U.S.C. 203(d).

29 C.F.R. § 531.54(b)(1) (emphasis added). Without a doubt, the FLSA prohibits an employer from requiring its employees to tip a manager or supervisor. That is not what happened at Cheetah.

Bosley signed Cheetah's Notice of Tip Credit which provides that "all of my tips I am to keep, other than what we give back **to the tip pool** for whoever receives tips." [Doc. 42-7, p. 35] (emphasis added); [Doc. 42-7, p. 197]. Bosley also reviewed the Policies, which provide, *inter alia*, that other than the 10% tip pool to bouncers and DJs, "[t]here is **no other mandatory tipping**. With the exception of any lawful contributions to a tip pool that you may be required to make, the applicable law requires that you be allowed to retain all of your remaining tips. **Management will not retain any of your tips**." [Doc. 42-7, p. 208] (emphasis added); [Doc. 42-7, pp. 48-52, 73-74, 110-112]. Cheetah also had a poster hanging on the bullet board that states: "Entertainers are **not permitted to tip anyone** including floor managers,

15

housemoms, waitstaff, or any Cheetah employee, **for referral or introduction to a VIP customer**, or **for recommending an entertainer** to any customer for a VIP room experience." [Doc. 42-7, p. 401]; see also [Doc. 42-7, pp. 112-113]. Bosley had seen and was aware of the poster during the course of her employment with Cheetah. [Doc. 42-7, pp. 112-113].

Although the Policies required a dancer to report to Braglia about any pressure to share tips outside of the tip pool, [Doc. 42-7, pp. 51-52, 110-112, 207-212], Bosley never spoke to Braglia regarding any issues with respect to tips or the tip pool and never reported to Braglia that she was tipping for VIP referrals. Id. at pp. 44, 52-54, 101-102, 112, 124. In fact, she never told anyone else at Cheetah about allegedly tipping outside of the tip pool. Id. at p. 55.

The FLSA does not "'prevent tipped employees from deciding, free from any coercion whatever and outside of any formalized arrangement or as a condition of employment, what to do with their tips, including sharing them with whichever co-workers they please.'" Roussell v. Brinker Int'l, Inc., 441 F. App'x 222, 230 (5th Cir. 2011) (citing DOL Field Operations Handbook § 30d04(g) (December 9, 1988)); see also Carts v. Wings Over Happy Valley MDF, LLC, 2023 WL 373175, at *7 (M.D. Pa. Jan. 24, 2023); Walsh v. Dayemi Org., Inc., 2022 WL 2291706, at *4 (S.D. Ill. June 24, 2022) ("tipped employee may voluntarily choose to share tips with an otherwise ineligible employee"); Lockett v. Pinnacle Ent., Inc.,

2021 WL 960424, *1, *6 (W.D. Mo. Mar. 12, 2021); Scalia v. Sofia & Gicelle, Inc., 2020 WL 7828770, at *9 (D. Md. Dec. 30, 2020) ("DOL therefore takes the view that 'a tipped employee may voluntarily share tips with whichever co-workers the tipped employee chooses.'").

Similarly, "nothing in the FLSA prohibits purely voluntary tip-pooling arrangements involving any other employee. . . . If the FLSA expressly exempts only mandatory tip pools from the retention requirement, but employees may nevertheless participate in voluntary tip pools, it follows that such voluntary arrangements do not violate the retention requirement because an employee has been permitted to retain his tips before opting to participate in the voluntary pool." Kubiak v. S.W. Cowboy, Inc., 164 F. Supp. 3d 1344, 1355, 1361 (M.D. Fla. 2016).[8] Thus, if an employee voluntarily tips a co-worker, "the employee has exercised legal ownership rights in that money because the employee has made the independent decision to share a portion of it with others." Id. at 1355, 1361.

In a recent district court case, the court discussed the language of 203(m)(2)(B) regarding "'keep[ing] tips'" and granted summary judgment to the defendant-employer on the tip pool claims based on the declaration stating that "while the plaintiffs were able to 'tip out,' or share some of their tips with other

---

[8] "Voluntarily 'tipping out' is different from an employer-mandated tip pool." See Tip Regulations Under the Fair Labor Standards Act (FLSA), 85 FR 86756-01.

employees who did not receive tips, '[t]ipping out in [the employer's business] was not controlled or mandated by [any of the defendants] or anyone else.'" Mayweather v. CVSM, LLC, 2023 WL 3852098, at *5 (D. Nev. June 5, 2023). And, like Cheetah, management and others did not participate in a tip pool. Id. The court concluded that "[b]ecause the plaintiffs do not provide any evidence that anyone [] forcibly retained a percentage of their tips, summary judgment is appropriate in the defendants' favor on the tip-pooling claim." Id.

Any tips Bosley gave to house moms or to bouncers outside of the tip pool were made voluntarily. [Doc. 42-7, pp. 53-54]. Cheetah's owners and managers never required, requested, or otherwise implied that anyone (including dancers) must tip or share tips with house moms. [Doc. 42-14, p. 3, ¶ 8]; [Doc. 42-15, p. 3, ¶ 8]; [Doc. 42-16, p. 3, ¶ 8]. None of the house moms forced, coerced, harassed, or intimated anyone to tip them. [Doc. 42-14, pp. 3-4, ¶ 9]; [Doc. 42-15, p. 3, ¶ 9]; [Doc. 42-16, p. 3, ¶ 9]. The house moms never told anyone that they have to or should tip them, and they have never said or suggested to anyone, including a dancer, that she will not be able to have days off (miss work) and/or leave work early if she does not tip them. Id. To the contrary, the house moms regularly and consistently told dancers they do not have to tip. Id. To the extent that dancers tip house moms, they do so voluntarily (and in violation of Cheetah policy). [Doc. 42-14, p. 4, ¶ 10]; [Doc. 42-15, p. 3, ¶ 10]; [Doc. 42-16, p. 3, ¶ 10].

18

Bosley, apparently, *chose* to tip house moms in certain circumstances. [Doc. 42-7, pp. 53-58, 78-79, 95-98]. Bosley *chose* to tip house moms "[w]hen they would help [her] pick an outfit or would give [her] advice, things like that, I would definitely tip them because they're helping [her]. And it just feels nice and such." [Doc. 42-7, pp. 78-79, 95]. Bosley also *chose* to tip house moms in order to leave early or miss work. [Doc. 42-7, pp. 95, 53-54, 57-58]. She *chose* to tip out house moms and bouncers for perceived benefits to herself. [Doc. 42-7, pp. 95-98]. Cheetah did not benefit from house moms letting dancers leave early or miss work. [Doc. 42-7, pp. 59-60]; [Doc. 42-14, p. 4, ¶ 13]; [Doc. 42-15, p. 4, ¶ 13]; [Doc. 42-16, p. 4, ¶ 13]. Further, dancers are not required to pay any amount to bouncers or anyone else for referring VIP customers to them. [Docs. 42-8 through 42-13, ¶ 14]. In fact, that is prohibited by Cheetah. Id. To the extent that Bosley voluntarily tipped bouncers, Bosley "never [had] a spoken arrangement" to tip for a VIP referral. [Doc. 42-7, p. 54]. Instead, Bosley would tip "depending on how much [she] made from that recommendation." [Doc. 42-7, p. 55]. In their Complaint, Plaintiffs alleged that: "While tipping the house moms is nominally optional, dancers—including Bosley— perceive that house moms are more likely to permit them to leave their shifts early if they regularly tip them." [Doc. 30, ¶ 28]. Plaintiffs also alleged that: "Dancers— including Bosley—regularly pay a 'referral fee' to bouncers when they 'refer' customers to them for more lucrative VIP performances." Id. at ¶ 29. Indeed, asked,

"[d]id you ever experience coercion, harassment, or intimidation regarding tips or the tip pool," Bosley said "[n]ot necessarily." [Doc. 42-7, p. 53]. .

It is undisputed that house moms were not included in the tip pool. It is undisputed that the Policies prohibited tips to anyone outside of the 10% tip pool to bouncers and disc jockeys. It is undisputed that Cheetah's posted notices also prohibited tips to *anyone* for a VIP referral. Bosley made a *choice* to ignore those directives. Remarkably, Bosley (or her lawyer) now argues that she *could not choose* what to do with her own tips. That is wrong. The FLSA does not prohibit an employee from giving a tip to a co-worker. Although it is an unquestionably protective statute, the FLSA does not prohibit an employee from the right to do with her money what she chooses, including to whom she gives tips and, if so, how much.

Any money Bosley chose to tip a bouncer or house mom for referring a VIP customer stayed with that bouncer or house mom. [Doc. 42-7, pp. 126]. Cheetah did *not* benefit from bouncers or house moms recommending *Bosley* to a VIP. [Doc. 42-7, pp. 59-60, 99]. Further, Cheetah does not use a tip credit to cover the minimum wages of bouncers or house moms. [Doc. 42-8 through 42-13, ¶ 13]; [Doc. 42-14, p. 4, ¶ 13]; [Doc. 42-15, p. 4, ¶ 13]; [Doc. 42-16, p. 4, ¶ 13]. Instead, each of the bouncers and house moms is paid an hourly rate at or above the minimum wage of $7.25 per hour. Id. Because Cheetah does not take a tip credit on the bouncers or house moms, "it cannot even be said that they use tips [from Bosley or other dancers]

to satisfy their other minimum-wage obligations." <u>Kubiak</u>, 164 F. Supp. 3d at 1362.

Bosley's voluntary tipping does not, as Bosley contends, give rise to *liability* of Cheetah under the FLSA. Plaintiffs, however, argue that "[e]ven if Bosley wanted to waive the FLSA's prohibition on tip sharing with managers and supervisors, she was not permitted to do so." Pls' Br., p. 18. This argument misses the mark. This is not a waiver issue. 29 U.S.C. § 203(m)(2)(B) does not restrict what *Bosley* could do with her tips. Instead, it prevents employers from keeping tips by "***allowing*** managers or supervisors to ***keep***" tips. 29 U.S.C. § 203(m)(2)(B) (emphasis added). The cases relied on by Plaintiffs are readily distinguishable, and none even mentions *voluntary tipping* or tipping at all. [9]

Here, there was no alleged contract or practice waiving or purporting to waive Bosley's right to a minimum wage or overtime pay. Bosley conceded she was paid $2.13 per hour plus tips and "her tips always exceeded the federal minimum wage." [Doc. 42-7, pp. 11-12 and 36]. The District Court was correct in holding that:

> The fact that 'FLSA rights cannot be abridged by contract or otherwise

---

[9] <u>See</u> <u>Barrentine v. Arkansas-Best Freight Sys., Inc.</u>, 450 U.S. 728, 740-41 (1981) (wage claim presented "to a joint grievance committee pursuant to the provisions of [an employee's] collective bargaining agreement" and held that "decisions interpreting the FLSA have frequently emphasized the nonwaivable nature of an individual employee's right to a minimum wage and to overtime pay under the Act [such as by contract]); <u>Tony & Susan Alamo Found. v. Sec'y of Lab.</u>, 471 U.S. 290, 300-01 (1985) (employees took position that "'no one ever expected any kind of compensation, and the thought is totally vexing to my soul'" but held that "these protestations, however sincere, cannot be dispositive"); <u>Brooklyn Savings Bank v. O'Neil</u>, 324 U.S. 697 (1945) (waiver of statutory liquidated damages).

waived,' Barrentine..., does not mean that an employee cannot voluntarily spend her earned wages in a way she chooses. (Doc. 53 at 8).

[Doc. 63, p. 10].

Next, Plaintiffs argue, as they did in their motion for reconsideration, that Cheetah did not argue at summary judgment that it had not "'allowed' the prohibited tip sharing arrangement." Pls' Br., p. 18. That position is belied by the record, including Cheetah's argument that "[t]here is *zero* evidence that Cheetah *kept* tips received by Bosley (or anyone else), including by "*allowing* managers or supervisors to keep any portion of employees tips." [Doc. 48, pp. 5-6].

As in the motion for reconsideration, Plaintiffs also now attempt to argue that "[t]he knowledge of managers and supervisors is attributable to the employer" such that the Court committed "another fundamental error" by finding that "'Defendant' . . . did not 'allow' the improper tip sharing because it had no notice." [Doc. 56, p. 6][10]. Plaintiffs' argument, again, fails. The cases relied on by Plaintiffs are inapposite.[11] None concerned tip pools or 29 U.S.C. § 203(m)(2)(B) provision

---

[10] Plaintiffs first raised that argument in the motion for reconsideration. As such, it should be disregarded entirely. See, e.g., Lopez v. City of W. Miami, 662 F. App'x 733, 737–38 (11th Cir. 2016) (disregarding new factual grounds and "'test [of] an alternative theory' in response to the district court's order on summary judgment"); Blue Mountain Holdings Ltd. v. Bliss Nutraceticals, LLC, 2022 WL 4130752, *1, *2 (N.D. Ga. Sept. 12, 2022) (denying motion for reconsideration); Landmark Infrastructure Holding Co. LLC v. N. Georgia Speculators, LLC, 2021 WL 5171487, at *1 (N.D. Ga. Oct. 7, 2021).

[11] Plaintiffs cite Sidell v. MedMark, 2017 WL 6994574, *1, *5 (N.D. Ga. 2017) (examining employer's knowledge of employee's overtime hours as element of

regarding "*allowing* managers or supervisors to keep any portion of employees tips" and only one case cited by Plaintiffs even mentions "tips." See n. 10. Indeed, six (6) of the seven (7) cases cited by Plaintiffs pre-date the addition to the FLSA of the language in 29 U.S.C. § 203(m)(2)(B).

This argument is also undercut by this reality: Bosley directly received and kept her own tips (there was no tip jar; no one held Bosley's tips), she counted out and paid into the 10% tip pool herself on the honor system (again, no one ever held Bosley's tips) [Doc. 42-7, p. 42], and she apparently chose to tip house moms and bouncers in addition to the tip pool in violation of Cheetah policy.

## B.    THIS COURT SHOULD *NOT* DISREGARD THE DOL DEFINITION OF "MANAGERS OR SUPERVISORS" IN FAVOR OF PLAINTIFFS' "PROPOSED MODIFIED DEFINITION."

1. The Duties Test Set Forth in 29 C.F.R. § 541.100(a)(2)-(4):

On April 6, 2018, the DOL issued Field Assistance Bulletin No. 2018-3

---

*overtime claim*); (Brennan v. Gen. Motors Acceptance Corp., 482 F.2d 825, 827-28 (5th Cir. 1973) (same); Reich v. Dep't of Conservation & Nat. Res., State of Ala., 28 F.3d 1076, 1082 (11th Cir. 1994) (same); Gulf King Shrimp Co. v. Wirtz, 407 F.2d 508, 511 (5th Cir. 1969) (employer knowledge of child labor); Hellmers v. Town of Vestal, N.Y., 969 F. Supp. 837, 846 (N.D.N.Y. 1997) (factual dispute about whether employer knew employee was working "off-the-clock"). The only case Plaintiffs cite that mentions "tips" is Barcellona v. Tiffany Eng. Pub, Inc., 597 F.2d 464, 466 (5th Cir. 1979), which pre-dated 29 U.S.C. § 203(m)(2)(B) by decades and which concerned former tip credit laws, not tip pools at all. The issue of ignorance arose in the context of "a defense to liability for liquidated damages." Id. at 468.

regarding the revisions to 29 U.S.C. § 203(m) to prohibit the participation of a manager or supervisor in a tip pool. [Doc. 42-5]. The bulletin provided that, "[a]s an enforcement policy, [the Division] will use the duties test at 29 C.F.R. § 541.100(a)(2)-(4) to determine whether an employee is a manager or supervisor for purposes of section 3(m)." [Doc. 42-5, p. 1]. Pursuant to 29 C.F.R. § 541.100(a), an employee is a "manager or supervisor" under 29 U.S.C. § 203(m)(2)(B) if her "primary duty is management of the enterprise . . . or of a customarily recognized department or subdivision," she "customarily and regularly directs the work of two or more other employees; and" she "has the authority to hire or fire . . . or whose suggestions . . . are given particular weight." 29 C.F.R. § 541.100(a)(2)-(4).

Significantly, Plaintiffs concede that bouncers are not "managers or supervisors" under the duties test and, therefore, not prohibited from participating in the tip pool at Cheetah. Instead, they urge this Court to disregard the DOL's regulation using the duties test set forth in 29 U.S.C. § 541.100(a)(2)-(4) to determine which employees are "managers or supervisors" under 29 U.S.C. § 203(m)(2)(B) in favor of a self-serving definition supplied by Plaintiffs.

The DOL issued its final rule regarding 29 U.S.C. § 203(m)(2)(B) on December 30, 2020. See Tip Regulations Under the Fair Labor Standards Act (FLSA), 85 FR 86756-01. Therein, DOL explained that its use of the duties test would be codified in 29 C.F.R. § 531.52(b)(2). "[T]he final rule uses the duties test,

but not the salary tests, from the FLSA's executive employee exemption to determine which individuals are managers or supervisors who may not keep tips under section 3(m)(2)(B). . . .[T]his exclusion ensures that the terms 'manager' and 'supervisor' encompass more individuals than the term 'executive' as used in section 13(a)(1) of the FLSA." <u>Id.</u> The DOL reviewed comments regarding proposed modifications to the definition, including one which, like Plaintiffs urge, "recommended that every employee who satisfies any of the three elements of the duties test be deemed a 'manager' or 'supervisor' under section 3(m)(2)(B)." <u>Id.</u> The DOL, however, rejected that proposal, concluding, after careful review, that "[u]sing the duties test *disjunctively* . . . would prevent employees who perform some lower-level managerial responsibilities from participating in tip pools, even if they are not bona fide managers or supervisors of the employer." <u>Id.</u> (emphasis added).

Thus, "[f]or purposes of section 3(m)(2)(B), the term "manager" or "supervisor" shall mean any employee whose duties match those of an executive employee as described in § 541.100(a)(2) through (4) or § 541.101 of this chapter." <u>See also</u> <u>Devillaz v. Atmosphere Gastropub, Inc.</u>, 2023 WL 3486611, at *4–5 (D. Colo. May 15, 2023). A district court in <u>Mayweather</u>, 2023 WL 3852098, at *5, granted summary judgment to an employer where there was "no evidence" that "owners and managers forced [employees to pay tips to managers, supervisors, and [others]" because, like here, "while the plaintiffs were able to 'tip out,' or share some

25

of their tips with other employees who did not receive tips, '[t]ipping out [] was not controlled or mandated by [any of the defendants] or anyone else.'"

    2. *Chevron* Deference to the DOL Regulation:[12]

The phrase "managers or supervisors" as used in 29 U.S.C. § 203(m)(2)(B) was not defined by Congress in enacting that provision. Thus, there was a "gap" for the DOL to fill. Chevron, U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837, 843-44 (1984); Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 158 (2007); Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 220 (2016).[13] A "gap" may be explicit or implicit. Chevron, 467 U.S. at 844. Where it is the implicit, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." Id. "[T]he court does not simply impose its own construction on the statute,[10] as would be necessary in the absence of an administrative interpretation." Id. As explained by the Supreme Court, "[w]e have long recognized that considerable weight should be accorded to an executive

---

[12] Plaintiffs do not raise any challenges to the DOL's compliance with all applicable procedures attendant to its rulemaking.

[13] After arguing that the definitions set forth in 29 C.F.R. § 531.52(b)(2) are not entitled to Chevron deference because Congress did not leave a "gap" to be filled by DOL, Pls' Br., pp. 23-26, Plaintiffs contradictorily argue that "[t]here is some merit in the Department of Labor's reliance upon categories already established in the interpretation of the FLSA for the **purpose of defining the new terms** 'supervisor' and 'manager.' Such an approach allows both employers and courts to engage in analysis that is already familiar to them, avoiding the need to create entirely **new interpretive categories**." Pls' Br., p. 27 (emphasis added).

department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations." Id.

Plaintiffs' argument that 29 C.F.R. § 531.52(b)(2) is merely "interpretive" and not a "regulation" readily fails. Pls' Br., pp. 22-23. Plaintiffs point to Monahan v. Cnty. of Chesterfield, Va., 95 F.3d 1263, 1273 (4th Cir. 1996), Pls' Br., p. 22, considering 29 C.F.R. § 778, which expressly provides that "[t]his part contains the DOL's general interpretations with respect to the meaning and application of the maximum hours and overtime pay requirements." 29 C.F.R. § 778.1. 29 C.F.R. § 778 is contained in Subchapter B ("Statements of General Policy or Interpretation Not Directly Related to Regulations"); whereas, 29 C.F.R. § 531.52 is contained in Subchapter A ("Regulations"). Further, even the Monahan court explained that even "'interpretation of a statute by the agency charged with its enforcement ordinarily commands considerable deference.'" 95 F.3d at 1273.

The Supreme Court has held that "the FLSA explicitly leaves gaps, for example, as to the scope and definition of statutory terms . . . [and] provides the Department with the power to fill these gaps through rules and regulations," and DOL has "the kind of thorough knowledge of the subject matter and ability to consult at length with affected parties [e.g., through rulemaking]." Long Island, 551 U.S. at 165, 167-68. "And it is consequently reasonable to infer (and we do infer) that Congress intended its broad grant of definitional authority to the Department to

include the authority to answer these kinds of questions." Id. at 168. Likewise, the Eleventh Circuit has also unequivocally held that, "[a]s with all agency rules, the DOL's regulations implementing the FLSA are accorded *Chevron* deference." See Falken v. Glynn Cnty., Georgia, 197 F.3d 1341, 1346 (11th Cir. 1999); see also Rodriguez v. Pure Beauty Farms, Inc., 503 F. App'x 772, 775 (11th Cir. 2013) ("We apply *Chevron* deference to the [DOL] regulations implementing the FLSA when the statutory text is ambiguous or leaves terms undefined.").

"The *Chevron* framework 'is rooted in a background presumption of congressional intent'—if a statute contains a gap to be filled, Congress desired the agency administering the statute, rather than the courts, to resolve this gap." Rest. L. Ctr., 2023 WL 4375518, at *4. "Congress tasked the DOL with interpreting the terms of the FLSA and issuing regulations thereunder. See generally 29 U.S.C. § 204 "We defer to those regulations when the statutory language is ambiguous or the statutory terms are undefined." Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1299 (11th Cir. 2011).

"[T]he court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation." Chevron, 467 U.S. at 843. "Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Id. at 844. Thus, the second step of Chevron analysis is whether the agency's interpretation is reasonable.

28

Id.; see also Long Island, 551 U.S. at 160. The DOL has reasonably interpreted who constitutes "managers or supervisors" under 29 U.S.C. 203(m)(2)(B).

Although Plaintiffs weakly argue that the "2018 amendment is 'clear and unambiguous,'" they fail to explain *how*, other than circularly noting that "[s]upervisors are supervisors and managers are managers." Pls' Br., p. 24. Yet, the statute says "managers *or* supervisors," not "managers *and* supervisors," indicating that Congress may have viewed the terms as synonymous for purposes of the tip pool participation issue.[14] Plaintiffs point to vague "congressional intent," Pls' Br., pp. 24-28, but cite *nothing* (*e.g.*, no legislative history or case law) demonstrating such alleged legislative intent. (As in <u>Chevron</u>, the legislative history is "unilluminating" and, in fact, "silent on the precise issue before us." 467 U.S. at 862.)[15] As the Supreme Court explained in <u>Chevron</u>, "[w]e are not persuaded that

---

[14] Congress may have simply wanted to avoid a scenario wherein a "manager" was called a "supervisor" by an employer to avoid the provision. As discussed in <u>Chevron</u>, "[p]erhaps that body consciously desired the Administrator to strike the balance at this level, thinking that those with great expertise and charged with responsibility for administering the provision would be in a better position to do so; perhaps it simply did not consider the question at this level; and perhaps Congress was unable to forge a coalition on either side of the question, and those on each side decided to take their chances with the scheme devised by the agency. For judicial purposes, it matters not which of these things occurred." 467 U.S. at 865.

[15] The 2018 amendments were part of an omnibus bill regarding federal appropriations for federal agencies and terrorism funding. Pub. L. 115-141 (03/23/2018). Contrary to Plaintiffs' repeated position, there is no evidence of Congressional intent to prohibit anyone with any supervisory role whatsoever from participating in a tip pool.

parsing of general terms in the text of the statute will reveal an actual intent of Congress. We know full well that this language is not dispositive; the terms are overlapping and the language is not precisely directed to the question of the applicability of a given term in the context of a larger operation." 467 U.S. at 861-62. Finally, Plaintiffs' citation to Aguila v. Corp. Caterers II, Inc., 199 F. Supp. 3d 1358 (S.D. Fla. 2016), aff'd sub nom. Aguila v. Corp. Caterers IV, Inc., 683 F. App'x 746 (11th Cir. 2017) for the argument that "Section 203(m)(2)(B) . . . is 'clear and unambiguous, leaving no room for agency interpretation,'" Pls' Br., p. 24, is grossly misleading. Aguila was a district court decision in *2016*, prior to the *2018* amendment and says *nothing* about the interpretation of 29 U.S.C. § 203(m)(2)(B).

Another district court recently closely examined and rejected virtually the same challenges Plaintiffs now raise about the DOL's definition of "managers or supervisors" pursuant to 29 U.S.C. § 203(m)(2)(B). Hoffman v. Bear Chase Brewing Co., LLC, 2023 WL 2352926, at *1, *3 (E.D. Va. Mar. 3, 2023) (finding that the terms were not "unambiguous," that the DOL had not "unreasonably interpreted 'managers or supervisors' conjunctively rather than disjunctively," and that the DOL definition was reasonable). "Because the statute here is ambiguous, it is reasonable for the DOL to supply one set criteria for 'managers or supervisors,' rather than defining those terms separately. Indeed, *Chevron* allows agencies to express reasonable interpretations of complete phrases, not just individual words." Id. at *4.

30

The DOL regulation is entitled to <u>Chevron</u> deference and is reasonable.

### 3. Plaintiffs' Self-Serving Proposed Definition:

Plaintiffs argue that the DOL's definition must be wrong simply because it "uses the exact same definition for both 'manager' and 'supervisor.'" Pls' Br., p. 24. Plaintiffs' arguments regarding the "*disjunctive* terms" of "managers or supervisors" is nothing more than pure conjecture. "[T]he meaning of a word must be ascertained in the context of achieving particular objectives, and the words associated with it may indicate that the true meaning of the series is to convey a *common idea*." <u>Chevron</u>, 467 U.S. at 861 (emphasis added). Moreover, "'[t]he definition[s] of words in isolation however, [are] not necessarily controlling in statutory construction. . . . Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis.'" <u>Cascabel Cattle Co., L.L.C. v. United States</u>, 955 F.3d 445, 451 (5th Cir. 2020). Congress intended a "higher-level employee" who *met certain criteria* to be barred from participating in a tip pool.

Plaintiffs cite two (2) blogs, including Indeed.com, to support their arguments. Pls' Br., pp. 24-25. Such cherry-picked definitions cannot override the DOL's carefully considered and codified final rule. Plaintiffs argue that this Court should disregard the DOL's regulation regarding "managers or supervisors" in favor of a definition crafted by Plaintiffs' lawyer to support their claims in this matter.

Specifically, Plaintiffs "make up" their own rule that an employee that fits into "any of the three categories of duties enumerated in 29 C.F.R. § 541.100(a)(2)-(4)" would be a "manager or supervisor" barred from participating in a tip pool. As set forth above, DOL already considered (and rejected) a disjunctive duties test rule. See Tip Regulations Under the Fair Labor Standards Act (FLSA), 85 FR 86756-01; c.f. Helix Energy Sols. Grp., Inc. v. Hewitt, 598 U.S. 39, 45–46, 143 S. Ct. 677, 683, 214 L. Ed. 2d 409 (2023) (DOL used a disjunctive duties test rule in a different context).

Under Plaintiff's self-serving definition, any employee that provides a mere *suggestion* about who to hire would be barred from participating in a tip pool. A server who has recommended that her boss hire her roommates would be barred from participating in a tip pool. A barista who completes a closing checklist with two (2) other baristas is barred from sharing the tip jar. A shift supervisor that does nothing more than oversee a few other employees during a shift, while taking on all of the same job duties as her co-workers, but no management, hiring, or firing duties, would be barred from participating in a tip pool. Plaintiffs' interpretation is, simply put, unreasonable and cannot replace the reasonable regulation by the DOL.

## C. THIS COURT SHOULD REVERSE THE DENIAL OF CHEETAH'S MOTION FOR SANCTIONS.

The issues raised by Plaintiffs were decided adversely to them in summary judgment decisions in multiple related actions against Cheetah. See Mays v. Int'l Follies, Inc., 2020 WL 13573506, at *1 (N.D. Ga. Sept. 25, 2020); Crittendon v.

Int'l Follies, Inc., 2021 WL 9274510, at *15 (N.D. Ga. July 7, 2021); Duren v. Int'l Follies, Inc., 2021 WL 9274495, at *14 (N.D. Ga. July 12, 2021).

During the Fed. R. Civ. P. Rule 26(f) conference, Cheetah's counsel informed Plaintiffs' counsel about the related matters, and, a few days later, emailed the District Court's (then-new) ruling in Crittendon. Yet, Plaintiffs refused to dismiss the instant action. As required by the safe harbor provision set forth in FED. R. CIV. P. 11, Cheetah served a copy of its motion for sanctions and brief in support on October 26, 2021. [Doc. 55-8]. Plaintiffs failed to take corrective action within the twenty-one (21) day safe harbor (or ever). FED. R. CIV. P. 11(c)(2). On March 27, 2023, this Court entered its Order [Doc. 53] granting Cheetah's Motion for Summary Judgment [Doc. 42].

Sanctions should be imposed if the claims are not "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law" or "factual contentions" lack "evidentiary support." FED. R. CIV. P. 11(b). "The goal of Rule 11 sanctions is to 'reduce frivolous claims, defenses, or motions, and to deter costly meritless maneuvers.'" Diaz v. First Marblehead Corp., 643 Fed. Appx. 916, 921 (11th Cir. 2016). Pleadings that lack a "reasonable factual basis" warrant the imposition of sanctions. Id. A key inquiry is whether there has been a pre-filing inquiry into the facts and the law. Id. Thus, "'[i]f, after dismissing a party's claim as baseless, the court finds that the party's attorney

33

failed to conduct a reasonable inquiry into the matter, then the court is *obligated* to *impose sanctions* even if the attorney had a good faith belief that the claim was sound.'" Id. Sanctions may be imposed "on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1).

Addressing Cheetah's motion for sanctions in the Final Order [Doc. 63], the District Court stated: "To begin, the Court exercises its discretion to deny the Sanctions Motion as untimely." [Doc. 63, p. 4]. In reaching that conclusion, however, the trial court ignored the Eleventh Circuit decision in Huggins v. Lueder, Larkin & Hunter, LLC, 39 F.4th 1342, 1346 (11th Cir. 2022) ("[A] Rule 11 motion filed within 30 days of final judgment was timely."). Cheetah served its motion and notice letter on October 26, 2021. The safe harbor deadline ended on November 16, 2021, and Cheetah moved for summary judgment six (6) months later on May 20, 2022. Cheetah filed its motion for sanctions just *four (4) days* after the trial court ruled on the summary judgment motion.

Further, the District Court incorrectly found that the motion for sanctions was primarily based on the prior orders. Order [Doc. 63], pp. 4-6. While Cheetah pointed to the four (4) prior decisions, it *further* discussed the (lack of) merits of Plaintiffs' claims on, *inter alia*, the grounds set forth above, including lack of factual support for its claims and the baseless legal arguments advanced by Plaintiffs. Plaintiffs and their counsel frivolously pursued this lawsuit in the face of contrary statutory

34

language, DOL regulations, and rulings about Cheetah's policies. In accordance with FED. R. CIV. P. 11(b)(1)-(3), sanctions should be imposed against Trustee and/or Plaintiffs' counsel in the uncontested amounts ($42,977.11 as of March 2023) plus additional amounts incurred since. [Doc. 55-9, pp. 4, 6-21].

## V. CONCLUSION

Plaintiffs allege that Bosley's voluntary tips to house moms and bouncers violated the FLSA and that the Court should rewrite the DOL's definition of "managers or supervisors" in such a way that would include bouncers. Both of those positions fail as a matter of law and fact as set forth above. This Court should affirm the District Court's grant of summary judgment to Cheetah on Plaintiffs' claims. By the same token, this Court should reverse the denial of Cheetah's motion for sanctions based on Plaintiffs' counsel and Trustee persisting in their baseless positions throughout the lawsuit.

Respectfully submitted this 12th day of April, 2024.

SCHULTEN WARD TURNER & WEISS, LLP

*/s/ Andrea L. Pawlak*
Andrea L. Pawlak, Georgia Bar No. 142541
Schulten Ward Turner & Weiss, LLP
260 Peachtree Street, N.W., Suite 2700
Atlanta, Georgia 30303
404-688-6800 (Phone)
404-688-6840 (Fax)
a.pawlak@swtwlaw.com
*Counsel for Appellee/Cross-Appellant*
*International Follies, Inc. d/b/a Cheetah*

35

## <u>CERTIFICATE OF COMPLIANCE AND SERVICE</u>

I hereby certify that this filing complies with the page and type-volume limitations of Fed. R. App. P. 32. It includes 9,398 words, excluding the parts exempted by 11th Cir. R. 32-4. I further certify that I have this day electronically filed the foregoing using the Court's CM/ECF system, which automatically sends email notification to all counsel of record.

So certified this 12th day of April, 2024.

SCHULTEN WARD TURNER & WEISS, LLP

*/s/ Andrea L. Pawlak*
Andrea L. Pawlak, Georgia Bar No. 142541
Schulten Ward Turner & Weiss, LLP
260 Peachtree Street, N.W., Suite 2700
Atlanta, Georgia 30303
404-688-6800 (Phone)
404-688-6840 (Fax)
a.pawlak@swtwlaw.com
*Counsel for Appellee/Cross-Appellant*
*International Follies, Inc. d/b/a Cheetah*